UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

LOWER EAST SIDE PEOPLE'S FEDERAL
CREDIT UNION, on behalf of itself and its
members,

                   Plaintiff,

    -against-

DONALD JOHN TRUMP, in his official
capacity as President of the United States of
America; JOHN MICHAEL MULVANEY, in
his capacity as the person claiming to be acting
director of the Consumer Financial Protection
Bureau,

                   Defendants.

Case No. 17 Civ. 9536 (PGG)

**REPLY MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION
FOR A PRELIMINARY INJUNCTION AND IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS**

Emery Celli Brinckerhoff & Abady LLP
600 Fifth Avenue, 10th Floor
New York, New York 10020
(212) 763-5000

<u>TABLE OF CONTENTS</u>

<u>PAGE NO.</u>

TABLE OF AUTHORITIES ...................................................................................iii-viii

"SHALL" STILL MEANS "SHALL" ........................................................................ 1

ARGUMENT ............................................................................................................ 2

    I.    Plaintiff States a Claim and Has a Substantial Likelihood of Success
        on the Merits ................................................................................................ 2

        A.    The CFPB Deputy Director "Shall Serve as Acting Director" ................. 2

        B.    Defendants' FVRA Argument Is Wrong ................................................ 5

                1.    Defendants Would Erase Section § 5491(b)(5)(B)
                    From the U.S. Code ...................................................... 5

                2.    Even If Dodd-Frank Did Conflict with the FVRA,
                    Dodd-Frank Would Control ........................................... 8

        C.    Defendants' Parade of Horribles Is Misplaced ....................................... 10

        D.    The President's Selection of Mr. Mulvaney Would Be
             Impermissible Even if Dodd-Frank Were Not Mandatory ...................... 12

        E.    The Appointment Violates the Constitution's Appointments
             Clause ................................................................................................ 14

        F.    Plaintiff's Claims Are Not Barred by the *Quo Warranto* Doctrine,
             and This Court has Authority to Issue Injunctive Relief ........................ 15

                1.    *Quo Warranto* Is No Defense Here ............................... 15

                2.    The President Is Not Above the Law ............................. 17

    II.    The Credit Union Has Standing ................................................................. 20

        A.    The Credit Union Is Regulated by the CFPB;
             It "Therefore Has Standing" ................................................................ 20

        B.    The Credit Union Also Has Standing Because it Objects
             to and is Harmed by Mr. Mulvaney's Actions at the CFPB ................... 24

    III.    The Credit Union Will Be Irreparably Harmed Absent an Injunction................. 29

        A.    Defendants Ask this Court to Ignore Binding Authority
             that Violations of Constitutional Rights are *Per Se* Irreparable .............. 29

B.      Regulation by an *Ultra Vires* Acting Director
        Causes Irreparable Harm.......................................................................... 30

C.      Defendants' Frustration of the Credit Union's Mission Also
        Causes Irreparable Harm.......................................................................... 31

IV.   The Balance of Equities and the Public Interest Support Plaintiff ...................... 33

CONCLUSION ........................................................................................................................ 34

## TABLE OF AUTHORITIES

PAGE NO.

**Cases**

*Anderson v. Yungkau*,
    329 U.S. 482 (1947) ................................................................................................. 2

*Andrade v. Regnery*,
    824 F.2d 1253 (D.C. Cir. 1987) ............................................................................ 17

*Arizona v. United States*,
    567 U.S. 387 (2012) ................................................................................................. 4

*Armstrong v. Exceptional Child Ctr., Inc.*,
    135 S. Ct. 1378 (2015) .......................................................................................... 20

*Barbieri v. RAJ Acquisition Corp.*,
    199 F.3d 616 (2d Cir. 1999) ................................................................................... 2

*Barcello v. Bonds*,
    349 U.S. 302 (1955) ................................................................................................. 6

*Beechwood Restorative Care Ctr. v. Leeds*,
    436 F.3d 147 (2d Cir. 2006) ................................................................................. 20

*Berry v. Reagan*,
    No. 83-3182, 1983 WL 538 (D.D.C. Nov. 14, 1983) ....................................... 17

*Boumediene v. Bush*,
    553 U.S. 723 (2008) ............................................................................................... 19

*Bronx Household of Faith v. Bd. of Educ. of City of N.Y.*,
    331 F.3d 342 (2d Cir. 2003) ................................................................................. 29

*Cherichel v. Holder*,
    591 F.3d 1002 (8th Cir. 2010) ............................................................................... 4

*Clinton v. City of New York*,
    524 U.S. 417 (1998) ............................................................................................... 19

*Clinton v. Jones*,
    520 U.S. 681 (1997) ......................................................................................... 17, 18

*Cohain v. Klimley*,
    No. 08 CIV. 5047 PGG, 2011 WL 3896095 (S.D.N.Y. Aug. 31, 2011) .......... 20

*Comm. for Monetary Reform v. Bd. of Govs. Of Fed. Reserve Sys.*,
    766 F.2d 538 (D.C. 1985) ..................................................................................... 28

*Conn. Dep't of Envtl. Prot. v. O.S.H.A.*,
   356 F.3d 226 (2d Cir. 2004)............................................................................. 29

*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*,
   561 U.S. 477 (2010)................................................................................. 23, 28

*Great Lakes Gas Transmission Ltd. P'ship v. FERC*,
   984 F.2d 426 (D.C. Cir. 1993)........................................................................ 28

*Henson v. Santander Consumer USA Inc.*,
   137 S. Ct. 1718 (2017)................................................................................. 1, 8

*Hooks v. Kitsap Tenant Support Servs.*,
   816 F.3d 550 (9th Cir. 2016) .......................................................................... 3

*Humphrey's Ex'r v. United States*,
   295 U.S. 602 (1935)...................................................................................... 12

*In re Crude Oil Commodity Litig.*,
   No. 06 Civ. 6677, 2007 WL 2589482 (S.D.N.Y. Sept. 7, 2007)..................... 20

*J.E.M. Ag Supply, Inc. v. Pioneer Hi–Bred Int'l, Inc.*,
   534 U.S. 124 (2001)........................................................................................ 2

*John Doe Co. v. Consumer Fin. Prot. Bureau*,
   849 F.3d 1129 (D.C. Cir. 2017) ........................................................ 23, 24, 30

*Jolly v. Coughlin*,
   76 F.3d 468 (2d Cir. 1996).............................................................................. 29

*King v. Burwell*,
   135 S. Ct. 2480 (2015) .................................................................................. 10

*Kingdomware Techs., Inc. v. United States*,
   136 S. Ct. 1969 (2016) .................................................................................... 2

*Latino Officers Ass'n v. Safir*,
   170 F.3d 167 (2d Cir. 1999)............................................................................ 29

*Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*,
   523 U.S. 26 (1998) .......................................................................................... 2

*Lockhart v. United States*,
   546 U.S. 142, 149 (2005)............................................................................... 6, 9

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992)...................................................................... 20, 21, 22

*Mackie v. Bush,*
    809 F. Supp. 144 (D.D.C. 1993) ........................................................................ 18

*Mackie v. Clinton,*
    10 F.3d 13 (D.C. Cir. 1993) ............................................................................... 18

*Marbury v. Madison,*
    5 U.S. (1 Cranch) 137 (1803) ............................................................................ 19

*Mississippi v. Johnson,*
    71 U.S. 475 (1866) ............................................................................................ 19

*N.Y. Civil Liberties Union v. N.Y. City Transit Auth.,*
    684 F.3d 286 (2d Cir. 2012) .............................................................................. 31

*N.Y. Times Co. v. U.S. Dep't of Justice,*
    138 F. Supp. 3d 462 (S.D.N.Y. 2015) ................................................................ 4

*Nat'l State Bank, Elizabeth, N. J. v. Long,*
    469 F. Supp. 1068 (D.N.J. 1979) ................................................................ 25, 26

*Nat'l Treasury Emps. Union v. Nixon,*
    492 F.2d 587 (D.C. Cir. 1974) ..................................................................... 18, 19

*New Eng. Power Generators Ass'n, Inc. v. FERC,*
    707 F.3d 364 (D.C. Cir. 2013) .......................................................................... 28

*New Process Steel, L.P. v. NLRB,*
    130 S. Ct. 2635 (2010) ...................................................................................... 11

*Nixon v. Fitzgerald,*
    457 U.S. 731 (1982) ..................................................................................... 18, 19

*NLRB v. SW Gen.,*
    137 S. Ct. 929 (2017) ........................................................................................ 14

*Nnebe v. Daus,*
    644 F.3d 147 (2d Cir. 2011) .............................................................................. 31

*Olympic Fed. Savs. & Loan Ass'n v. Dir., Office of Thrift Supervision,*
    732 F. Supp. 1183 (D.D.C. 1990) ................................................................ 21, 30

*Owner-Operator Indep. Drivers Ass'n, Inc. v. U.S. Dep't. of Transp.,*
    724 F.3d 230 (D.C. Cir. 2013) ............................................................................ 9

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank,*
    566 U.S. 639 (2012) ........................................................................................... 9

*Rio Grande Pipeline Co. v. FERC,*
    178 F.3d 533 (D.C. Cir. 1999) ........................................................................... 28

*Ryder v. United States,*
    515 U.S. 177 (1995) .......................................................................................... 16

*Simon v. E. Ky. Welfare Rights Org.,*
    426 U.S. 26 (1976) ............................................................................................ 31

*State Nat'l Bank of Big Spring v. Lew,*
    795 F.3d 48 (D.C. Cir. 2015) .................................................................... *passim*

*State Nat'l Bank of Big Spring v. Lew,*
    958 F. Supp. 2d 127 (D.D.C. 2013) ................................................................. 22

*State Nat'l Bank of Big Spring v. Lew,*
    197 F. Supp. 3d 177 (D.D.C. 2016) ................................................................. 25

*Statharos v. N.Y. City Taxi & Limousine Comm'n,*
    198 F.3d 317 (2d Cir. 1999) ............................................................................ 29

*SW Gen., Inc. v. NLRB,*
    796 F.3d 67 (D.C. Cir. 2015) ............................................................... 14, 16, 17

*Swan v. Clinton,*
    100 F.3d 973 (D.C. Cir. 1996) ......................................................................... 18

*TCF Film Corp. v. Gourley,*
    240 F.2d 711 (3d Cir. 1957) .............................................................................. 4

*Tenaska Wash. Partners II, L.P. v. United States,*
    34 Fed. Cl. 434 (Ct. Fed. Claims 1995) ............................................................ 4

*United States v. Arizona,*
    641 F.3d 339 (9th Cir. 2011) ............................................................................. 4

*United States v. Burr,*
    25 F. Cas. 187 (No. 14,694) (Cir. Ct. D. Va. 1807) ........................................ 19

*United States v. Germaine,*
    99 U.S. 508 (1878) ........................................................................................... 14

*United States v. Nixon,*
    418 U.S. 683 (1974) ......................................................................................... 19

*United States v. Restrepo,*
    986 F.2d 1462 (2d Cir. 1993) .......................................................................... 20

vi

*United States v. Storer Broad. Co.*,
   351 U.S. 192 (1956) ........................................................................... 28

*United States v. Venturella*,
   391 F.3d 120 (2d Cir. 2004) ................................................................. 3

*Williams v. Phillips*,
   360 F. Supp. 1363 (D.D.C. 1973) ................................................. 14, 15

*Youngstown Sheet & Tube Co. v. Sawyer*,
   343 U.S. 579 (1952) .................................................................... 17, 18

**Statutes**

5 U.S.C. § 3345 ........................................................................... *passim*

5 U.S.C. § 3346 ........................................................................... 11, 12

5 U.S.C. § 3347 ........................................................................... 3

5 U.S.C. § 3349 ........................................................................... 12

12 U.S.C. § 1812 ........................................................................... 13

12 U.S.C. § 2801(b) ........................................................................... 25

12 U.S.C. § 5491 ........................................................................... *passim*

12 U.S.C. § 5497(a)(4)(E) ................................................................ 13

12. U.S.C. § 4512(f) ........................................................................... 3

29 U.S.C. § 153 ........................................................................... 3

38 U.S.C. § 304 ........................................................................... 7

40 U.S.C. § 302 ........................................................................... 7

42 U.S.C. § 902 ........................................................................... 7

D.C. Code § 16-3501 ........................................................................... 15

**Other Authorities**

11A Wright & Miller, Federal Practice & Procedure § 2948.1 (3d ed.)......................................... 29

144 Cong. Rec. S6413 (daily ed. June 16, 1998).......................................................................... 14

Electronic Fund Transfers (Regulation E), 77 FR 50244-01 ........................................................ 22

*Guidance on Application of Federal Vacancies Reform Act of 1998*,
    23 Op. O.L.C. 60 (1999) ......................................................................................................... 4

Jerry Mashaw, *Federal Administration and Administrative Law in the Gilded Age*,
    119 Yale L.J. 1362 (2010) ...................................................................................................... 19

Jonathan Siegel, *Suing the President: Nonstatutory Review Revisited*,
    97 Colum. L. Rev. 1612 (1997) ............................................................................................. 19

S. Rep. No. 105-250 (1998) ......................................................................................................... 14

Symposium, *Freedom of the Press*,
    127 Harv. L. Rev. 2234 (2014) .............................................................................................. 26

## "SHALL" STILL MEANS "SHALL"

Defendants cannot deny Ms. English the position of Acting Director without changing the English language. Notwithstanding 43 pages of linguistic gymnastics, the "Deputy Director" of the CFPB "shall . . . serve as acting Director in the absence or unavailability of the Director." 12 U.S.C. § 5491(b)(5)(B). That is the plain, dispositive language in this case.

Defendants and their amici have a large statutory wish list for this Court. They would like to change "shall" to "may." They would change "unavailability" to "temporary unavailability." They would add at the end: "unless the President appoints someone else."

Defendants have a forum for these proposed amendments: Congress. But the "proper role of the judiciary" is "to apply, not amend, the work of the People's representatives." *Henson v. Santander Consumer USA Inc.*, 137 S. Ct. 1718, 1726 (2017).

Failing to escape the command of Dodd-Frank, defendants resort to an outdated, "feudal" *quo warranto* argument, and even worse, the Nixonian/Trumpist claim that courts cannot stop presidents from violating the law. Neither argument survives serious scrutiny.

Finally, devoid of any argument on the merits, defendants claim that the Credit Union regulated and now harmed by Mr. Mulvaney has no standing to challenge his illegal appointment, and we should wait until the Credit Union is harmed even further before granting an injunction. But by their own admission, defendants are every day establishing facts on the ground that will be difficult to "upend." No one seriously believes that Mr. Mulvaney's actions could be undone or remedied in one, two or three years. This is the very definition of irreparable harm.

Plaintiff's motion for a preliminary injunction should be granted, and the motion to dismiss denied.

## ARGUMENT

### I.  PLAINTIFF STATES A CLAIM AND HAS A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS

#### A.  The CFPB Deputy Director "Shall Serve as Acting Director"

The "Deputy Director" of the CFPB "shall . . . serve as acting Director in the absence or unavailability of the Director." 12 U.S.C. § 5491(b)(5)(B). As the Supreme Court and Second Circuit often remind us, "shall" is not optional language. It is "mandatory." *See* Mov. Br. 7 (collecting cases); *Barbieri v. RAJ Acquisition Corp.*, 199 F.3d 616, 619 (2d Cir. 1999) ("The term 'shall,' as the Supreme Court has reminded us, generally is mandatory and leaves no room for the exercise of discretion by the trial court.").[1]

Defendants now claim that "shall" does not mean "shall" after all. For example, though "[t]he Director shall serve for a term of 5 years," the President "may remove the Director" for cause. 12 U.S.C. § 5491(c) (1, 3). This argument is misplaced for a number of reasons. First, different provisions in the same statute must be read together. *See J.E.M. Ag Supply, Inc. v. Pioneer Hi–Bred Int'l, Inc*., 534 U.S. 124, 143-44 (2001). Read together, this language means that the Director shall serve a 5-year term, except that the President may remove her for cause. Plainly, though, the Director cannot serve a 7-year term, or a 50-year term. The term "shall" be 5 years.[2] The argument is poor for a second reason: in the "term" example, two specific and qualitatively different provisions (length of term, circumstances of removal) must be harmonized and read together. In this case, however, two provisions (one general, one specific) speak to the

---

[1] *See also Kingdomware Techs., Inc. v. United States*, 136 S. Ct. 1969, 1977 (2016); *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1998); *Barbieri*, 199 F.3d at 619; *Anderson v. Yungkau*, 329 U.S. 482, 485 (1947).

[2] Similarly, most contracts for high-level executives contain provisions for a term of employment and a for-cause removal. No reasonable lawyer would claim that one term trumps the other; to the contrary, the terms—which speak to different but overlapping issues—would be harmonized and read together.

*same* question: who becomes the Acting Director. One of them (the FVRA) is general, permissive,[3] and has an express exception.[4] The other (Dodd-Frank) is specific, mandatory, and has no exception.[5]

Defendants next suggest that, read literally, Section 5491(b)(5)(B) means that a Director who attempts to resign could be chained in his office until his 5-year term ends. Def. Br. 25. This ignores another canon of statutory construction: "[a] statute should be interpreted in a way that avoids absurd results." *United States v. Venturella*, 391 F.3d 120, 126 (2d Cir. 2004) (collecting cases). The most natural reading of this mandatory language is that the Director's term shall be 5 years long.

Defendants' amicus, the Chamber of Commerce, notes that in creating the office of the Director of the Federal Housing Finance Agency, Congress provided that the president "shall designate" certain persons to be acting director. 12. U.S.C. § 4512(f). The Chamber admits that "shall" is mandatory there, and notwithstanding the FVRA, "eliminate[s] the President's discretion." Dkt. 27-1 at 19-20. Just so here. "Shall" is mandatory language, and notwithstanding the FVRA, "eliminates the president's discretion" to appoint an Acting Director to the CFPB.[6]

As to "absence or unavailability," even defendants previously admitted it includes resignation. Their lawyers at the OLC wrote: "[T]he provision's reference to 'unavailability' is

---

[3] 5 U.S.C. § 3345(a)(2) ("may").

[4] 5 U.S.C. § 3347(a)(1)(B) ("unless").

[5] *Hooks*, again, is irrelevant. *See Hooks v. Kitsap Tenant Support Servs.*, 816 F.3d 550 (9th Cir. 2016); 29 U.S.C. 153(d). Unlike § 5491(b)(5)(B), 29 U.S.C. § 153(d) is not mandatory at all. To the contrary, it provides that "the President is authorized to designate" an acting general counsel. *See also* Dkt. 14-1 at 7-8.

[6] Defendants also argue that, because the Deputy Director "shall . . . be appointed by the Director," 12 U.S.C. § 5491(b)(5)(B), Director Cordray must in a literal reading have "violated Dodd-Frank by leaving the Deputy Director position vacant for years leading up to his last day in office." Def. Br. 25-26. That may be true, but no one brought that lawsuit.

best read to refer . . . to the Director's being unavailable because of a resignation or other

vacancy in office." OLC Memo at 3-4.[7] That OLC opinion is binding on defendants.[8] The very

statute on which they rely recognizes that a vacancy occurs when an officer "dies, resigns, or is

---

[7] From the OLC memo:

> [T]he provision's reference to 'unavailability' is best read to refer . . . to the Director's being unavailable because of a resignation or other vacancy in office. *See Acting Attorney General*, 31 Op. O.L.C. at 209 n.1 (referring to officials who "have died, resigned, or *otherwise* become unavailable") (emphasis added); *Designation of Acting Solicitor of Labor*, 26 Op. O.L.C. 211, 214 (2002) (describing provisions of the Vacancies Reform Act as contemplating "that a 'vacancy' occurs when the occupant dies or resigns or is *otherwise* unavailable") (emphasis added). *Cf. TCF Film Corp. v. Gourley*, 240 F.2d 711, 714 (3d Cir. 1957) (observing, for purposes of law-of-the-case doctrine, that a judge who "dies or resigns from the court . . . obviously is no longer available") (footnote omitted). This broader reading of "unavailability" is consistent with how this Office has interpreted the Vacancies Reform Act's reference to when an officer "dies, resigns, or is otherwise unable to perform the functions and duties of the office." 5 U.S.C. § 3345(a). In our view, an officer is "unable to perform the functions and duties of the office" during both short periods of unavailability, such as a period of sickness, and potentially longer ones, such as one resulting from the officer's removal (which would arguably not be covered by the reference to "resign[ation]"). *See Guidance on Application of Federal Vacancies Reform Act of 1998*, 23 Op. O.L.C. 60, 61 (1999) ("In floor debate, Senators said, by way of example, that an officer would be 'otherwise unable to perform the functions and duties of the office' if he or she were fired, imprisoned, or sick.") (citing statements by Senators Thompson and Byrd). We think that "unavailability" should be similarly construed, and thus that 12 U.S.C. § 5491(b)(5) would authorize a properly appointed Deputy Director of the CFPB to serve as its Acting Director during a true vacancy in the Director position.

[8] *See, e.g.*, *Cherichel v. Holder*, 591 F.3d 1002, 1016 n.17 (8th Cir. 2010) ("OLC opinions are generally binding on the Executive branch"); *United States v. Arizona*, 641 F.3d 339, 385 n.16 (9th Cir. 2011) (Noonan, J., concurring) ("the Department of Justice is required to comply with Opinions from the Office of Legal Counsel"), *aff'd in part, rev'd in part, Arizona v. United States*, 567 U.S. 387 (2012); *N.Y. Times Co. v. U.S. Dep't of Justice*, 138 F. Supp. 3d 462, 478 (S.D.N.Y. 2015) ("[M]emoranda of the Office of Legal Counsel are authoritative in a way that the memoranda here are not—because OLC's advice constitutes binding authority within the executive branch.") (emphasis omitted); *Tenaska Wash. Partners II, L.P. v. United States*, 34 Fed. Cl. 434, 439 (Ct. Fed. Claims 1995) ("Memoranda issued by the [Office of Legal Counsel], including this one, are binding on the Department of Justice and other Executive Branch agencies and represent the official position of those arms of government.").

*otherwise* unable to perform the functions and duties of the office." 5 U.S.C. § 3345(a)

(emphasis added).

But now defendants equivocate, claiming that absent may not really mean absent and

unavailable may not really mean unavailable. No matter. When Director Cordray resigned, was

he available? No. He was unavailable.[9] Defendants can stand on a head of pin, but they cannot

change English.

Defendants and their amicus concede they would like "unavailable" to mean "temporarily

unavailable." Dkt. 27-1 at 15-17 (Chamber of Commerce); Def. Br. 24 ("'unavailability' *often*

has a temporary quality") (emphasis added). But the statute says "unavailable," not "temporarily

unavailable." Had Congress wanted to limit Dodd-Frank to "temporary" unavailability, it could

and would have said so.

This is neither the time nor the forum for defendants and their amici to rewrite the statute.

They can go to Congress to rewrite the law. Under current law, when Director Cordray made

himself both absent and unavailable, Ms. English was the Deputy Director. That is undisputed.

Ms. English is the Acting Director. 12 U.S.C. § 5491(b)(5)(B).

## B.    Defendants' FVRA Argument Is Wrong

### 1.    Defendants Would Erase Section § 5491(b)(5)(B) From the U.S. Code

Defendants advance a few hodgepodge arguments in a futile attempt to chip away at the

plain, mandatory language that controls this case.

First, relying on the non-specific, default FVRA, defendants repeatedly claim that

plaintiff intends to "repeal a prior statutory enactment through subsequent legislation [Dodd-

Frank]." Def. Br. 22. Not true. The FVRA and Dodd-Frank work just fine together. By its own

---

[9] *Unavailable*, Merriam Webster Online Dictionary, https://goo.gl/MwSrpD (defining
"unavailable" as "not available: such as . . . unable or unwilling to do something").

terms, the FVRA does not apply if another "statutory provision expressly designates an officer or employee to perform the functions and duties of a specified office temporarily in an acting capacity." 5 U.S.C. § 3347(a)(1)(B). Here, Dodd-Frank "expressly designates an officer [the Deputy Director] to perform the functions and duties of a specified office [the Director] temporarily in an acting capacity." 12 U.S.C. § 5491(b)(5)(B). Therefore, the FVRA does not apply and Dodd-Frank controls. There is nothing to "repeal" here.

Next, defendants suggest that Dodd-Frank is not "express" enough. It is apparently insufficient to make plain, in simple, mandatory English, who becomes Acting Director. Rather, defendants say, Dodd-Frank must *also* expressly say "*that the FVRA does not apply*." Def. Br. 22 (emphasis added); *see* Def. Br. 27 (searching for "express statement in the statute that Section 5491 supersedes the FVRA."). This is incorrect. Nowhere does the FVRA say that a later statute must expressly *disclaim the FVRA*. No case says that. As the Supreme Court has warned, such "magical passwords" are not necessary. *Barcello v. Bonds*, 349 U.S. 302, 310 (1955); *Lockhart v. United States*, 546 U.S. 142, 149 (2005) (Scalia, J. concurring) ("the later enactment governs, *regardless* of its compliance with an earlier-enacted requirement of an express reference or other 'magical password'") (emphasis in original).

All that is necessary under the plain language of the FVRA is for a "statutory provision" to "expressly designate[] an officer or employee to perform the functions and duties of a specified office temporarily in an acting capacity." 5 U.S.C. § 3347(a)(1)(B). That is exactly what Dodd-Frank does, in the most plain, express terms possible. 12 U.S.C. § 5491(b)(5)(B).

Next, defendants cite this language in Dodd-Frank: "*Except* as otherwise provided expressly by law, all Federal laws dealing with public or Federal contracts, property, works, officers, employees, budgets, or funds . . . shall apply to the exercise of the powers of the

6

Bureau." 12 U.S.C. § 5491(a) (emphasis added). How this boilerplate language helps defendants is a mystery. The "[e]xcept" clause applies. A "law" (Dodd-Frank) "provide[s] expressly" that the CFPB "Deputy Director . . . shall . . . serve as acting Director in the absence or unavailability of the Director." 12 U.S.C. § 5491(b)(5)(B).[10]

At the end, defendants' approach violates the two most vital principles of statutory construction. First, every section of a statute must have meaning, *see* Mov. Br. 9-10 (collecting cases), but in defendants' view, 12 U.S.C. § 5491(b)(5)(B) has no meaning. This language—the "Deputy Director . . . shall . . . serve as acting Director in the absence or unavailability of the Director"—vanishes from the U.S. Code. Or worse, it is rewritten: the "Deputy Director may serve as Acting Director, unless the President appoints someone else." *Cf.*, *e.g.*, 40 U.S.C. § 302 (General Services Administration) ("[T]he Deputy Administrator is Acting Administrator . . . *unless* the President designates another officer of the Federal Government.") (emphasis added); 38 U.S.C. § 304 (Veterans Affairs) ("*Unless* the President designates another officer of the Government, the Deputy Secretary shall be Acting Secretary of Veterans Affairs . . . in the event of a vacancy in the office of Secretary.") (emphasis added); 42 U.S.C. § 902 (Social Security Administration) ("The Deputy Commissioner shall be Acting Commissioner" in the event of a vacancy in the office of the Commissioner "*unless* the President designates another officer of the Government as Acting Commissioner.") (emphasis added). Defendants have no meaningful answer to this fundamental point.[11]

---

[10] Ironically, defendants rely on this language because it is mandatory ("shall apply"). When convenient for defendants, "shall" means "shall" after all.

[11] Defendants' argument makes even less sense given that the FVRA *already* provides that "the first assistant" (in this case, the Deputy Director) "shall" be the acting director, 5 U.S.C. § 3345(a)(1), except that "notwithstanding" this language, the president "may" appoint someone else, 5 U.S.C. § 3345(a)(2).

Second, as defendants concede, different statutes must be read in harmony. Mov. Br. 10. In plaintiff's interpretation, Dodd-Frank and the VFRA are easily read together. *See supra*. In defendants' interpretation, the FVRA vanquishes Dodd-Frank.

A hypothetical illustrates the point. Imagine that a default "Federal Terms Act" provides that terms for agency directors "shall" be 5 years, except that the president "may" limit terms to 4. The "FTA" is the exclusive means for determining term length, "unless" another "statutory provision expressly designates the length of a term for a specific executive agency." Dodd-Frank provides that a CFPB "Director shall serve for a term of 5 years." 12 U.S.C. § 5491(c)(1). How long must the CFPB director's term be? The answer is plain. The term "shall" be 5 years. It is an "express" designation of term length, and therefore the FTA exception applies. No one would say the president could change the term to 4 years. That would eviscerate Section 5491(c)(1).

In pure textual terms, that is this case.

Courts must presume "that the legislature says . . . what it means and means . . . what it says." *Henson*, 137 S. Ct. at 1725 (brackets and quotation marks omitted). The Court should apply the plain language of Dodd-Frank. It is the only approach that does not rewrite the law. It is the only approach that harmonizes Dodd-Frank and the FVRA. The "Deputy Director . . . shall. . . serve as acting Director in the absence or unavailability of the Director." 12 U.S.C. § 5491(b)(5)(B). Ms. English is the Acting Director.

**2.      Even If Dodd-Frank Did Conflict with the FVRA, Dodd-Frank Would Control**

As both sides now seem to agree, Dodd-Frank and the FVRA do not conflict. Reading them together, the Deputy Director becomes the Acting Director. *See supra*.

But to the extent there is any conflict, the later, more specific, mandatory statute (Dodd-Frank) controls. Plaintiff's motion advanced five arguments in support of this conclusion. Mov. Br. 11-13. Defendants fail to refute any of them.

*First*, Dodd-Frank was enacted **more recently** than the FVRA. That is undisputed. "[T]he more recent legal pronouncement controls." *Owner-Operator Indep. Drivers Ass'n, Inc. v. U.S. Dep't. of Transp.*, 724 F.3d 230, 233 (D.C. Cir. 2013); *Lockhart*, 546 U.S. at 149 (Scalia, J. concurring) ("When the plain import of a later statute directly conflicts with an earlier statute, the later enactment governs."). Defendants have no meaningful response to this.

*Second*, Dodd-Frank's language is plainly **more specific** than the default FVRA. Once we acknowledge that Section § 5491(b)(5)(B) applies to resignations—as *even DOJ* did until this inconvenient lawsuit— there is no dispute which is the more specific statute. Dodd-Frank lasers in on the succession to CFPB Acting Director. The FVRA says nothing about the CFPB. "[T]he specific governs the general." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012). Again, defendants have no good response.

*Third*, Dodd-Frank is **mandatory**. Defendants suggest somewhat bizarrely that the FVRA is "mandatory," Def. Br. 26, but that is wrong. The FVRA says the president "may" appoint, 5 U.S.C. § 3345(a)(2). "May," not "shall." The mandatory, 12 U.S.C. § 5491(b)(5)(B) ("shall") trumps the permissive, 5 U.S.C. § 3345(a)(2) ("may").

*Fourth*, Dodd-Frank's **legislative history** makes clear that, in passing Dodd-Frank, Congress decided that FVRA should *not* apply to the CFPB Acting Director. Mov. Br. 12. One need only ask Messrs. Dodd and Frank, who filed a brief in support of plaintiff in this case. Dkt. 14-1. It cannot seriously be disputed that an earlier version of Dodd-Frank did not include

mandatory Deputy Director succession to Acting Director, and the later version (now law) does. Mov. Br. 12.

*Fifth*, only plaintiff's interpretation is consistent with the CFPB's "legislative plan." *King v. Burwell*, 135 S. Ct. 2480, 2496 (2015) ("A fair reading of legislation *demands* a fair understanding of the legislative plan.") (emphasis added). It is undisputed that the "legislative plan" for the CFPB was to be independent. *See, e.g.*, Dkt. 19-1 at 5-14. Dodd-Frank designed the CFPB to be "an independent bureau," 12 U.S.C. § 5491(a), with separate funding and placement within the Federal Reserve. Mr. Mulvaney, though, is dependent and subordinate. Neither defendant even bothers to dispute that Mr. Trump controls both Mr. Mulvaney and the CFPB. Dkt. 10-2, Maazel Decl. Ex. 3 (Trump tweet). Installation of a dependent underling into the top position at the CFPB sabotages Dodd-Frank's "legislative plan." *King*, 135 S. Ct. at 2496; *see* Dkt. 14-1 at 4 (Brief of Dodd and Frank: "[A]s Congress recognized at the time, [FVRA] procedures would permit the President to hand-pick an acting Director without the check of Senate confirmation, allowing that acting Director, no matter how close his ties to the President, to head the Bureau for many months. Such a result would plainly undermine the independence that was so critical to Congress's plan in designing the Bureau."); *id.* at 16-19. Defendants' response? None.

Every single one of these arguments supports plaintiff's interpretation. Defendants' seizure of the CFPB violates Dodd-Frank's mandatory text, basic principles of statutory construction, legislative history, structure, and legislative plan. Ms. English is the Acting Director.

### C.    Defendants' Parade of Horribles Is Misplaced

Defendants claim to worry that an Acting Director not appointed by the president could remain in the position indefinitely. The claim is (i) irrelevant (because defendants must follow

the law even if this were true), and (ii) not true in any event. First, the president can nominate a Director to the Senate at any time, and upon confirmation, the Acting Director would be replaced. Second, only the president can nominate the Director, and the Director (nominated by the president and confirmed by the Senate) appoints the Deputy Director. The president has substantial control over the Deputy Director through this process. Third, the president can remove the Acting Director for good cause. 12 U.S.C. § 5491(c)(3).

The true danger is what is happening now. To circumvent the Senate, the president nominates no one to be Director. Instead, he installs his at-will employee into the job. He can then keep his employee as Acting Director for at least 210 days, and as long as he eventually sends a nomination "pending in the Senate" 5 U.S.C. § 3346(a)(2), he can keep his Acting Director at the CFPB indefinitely. This is a recipe for a lack of presidential accountability, a subversion of the confirmation process, and a serious constitutional problem. *See infra* § I(E).

As to Defendants' hypothetical where "the Director's office becomes vacant and there is no appointed Deputy Director," Def. Br. 29, either (i) the president could nominate a Director to the Senate; (ii) the Bureau will not have an Acting Director for some period[12]; or (iii) the FVRA might actually apply: with no Deputy Director, 12 U.S.C. § 5491(b)(5)(B) by its own terms arguably might not apply; therefore, arguably no other statutory provision would expressly apply, 5 U.S.C. § 3347(a)(1)(B), and the president "may" appoint someone else, 5 U.S.C. § 3345(a)(2).

But we need not deal with hypotheticals here. All agree: Ms. English was the Deputy Director. She "shall . . . serve as acting Director." 12 U.S.C. § 5491(b)(5)(B).

---

[12] Multi-member commissions are sometimes without a quorum, yet there is no dispute that FVRA is unavailable. *See, e.g.*, *New Process Steel, L.P. v. NLRB*, 130 S. Ct. 2635, 2639 (2010) (deciding nearly 600 cases during the "27-month period in which the [NLRB] had only two members").

Defendants also claim vaguely that their interpretation is necessary to avoid unnamed "constitutional questions." Def. Br. 29. But there is no authority for the proposition that the president's ability to faithfully executive the nation's laws is meaningfully impaired when the head of an independent agency leaves before his term expires, and the president is required to obtain Senate confirmation before making his mark on the agency. This unsupported proposition is also flatly inconsistent with the very idea of an independent agency. *See Humphrey's Ex'r v. United States*, 295 U.S. 602, 629 (1935). In addition, as amici note, "[n]early all independent agencies are structured so as to prevent presidents from achieving what President Trump is attempting here." Dkt. 14-1 at 17-18 (citing the SEC, FEC, and Federal Housing Finance Agency). There is nothing novel about preventing a president from bypassing the Senate to seize control of an independent agency. *Id.*

If anything, as 17 States explained in their amicus brief, *see* Dkt. 24-1, President Trump's attempted end-run around Senate confirmation would raise constitutional concerns of its own in the absence of clear statutory authorization, potentially allowing Mr. Mulvaney to serve as Acting CFPB Director for years from his post in the White House. *See* 5 U.S.C. § 3346.

**D.     The President's Selection of Mr. Mulvaney Would Be Impermissible Even if Dodd-Frank Were Not Mandatory**

Even if Dodd-Frank's mandatory succession statute were rewritten to be permissive, the president's selection of Mr. Mulvaney would still be impermissible. As our motion lays out (at 13-16), that is true for two reasons. One: It flouts Congress's design in creating the CFPB as an "independent bureau." 12 U.S.C. § 5491(a). Two: The FVRA, by its terms, does not apply to the appointment of "any member" of a multi-member board that "governs an independent establishment or Government corporation," 5 U.S.C. § 3349c(1), and the CFPB Director, as an

12

automatic FDIC board member, is such a member, *see* 12 U.S.C. §§ 1812(a)(1)(B), 1812(d)(2).
Defendants fail to refute either point.

On the first point, they have very little to say. Their argument is essentially: nothing in
the FVRA specifically precludes the president from selecting Mr. Mulvaney as CFPB Acting
Director. Def. Br. 31-32. This argument is largely non-responsive to the real thrust of our
point—that Congress created the CFPB to be insulated from the president. It is striking that the
president does not even dispute that his selection of Mr. Mulvaney has put the agency under his
thumb, indefinitely. Just the opposite. *See* Maazel Decl. Ex. 3.

There is a reason Congress wanted the CFPB's Director to be removable only for cause,
and took specific steps to shield the agency's independence from OMB. *See, e.g.*, 12 U.S.C.
§ 5497(a)(4)(E). The President's selection of OMB Director Mulvaney stymies Congress's
intent. As amicus Peter Conti-Brown summarizes: The President's "decision to appoint a White
House official to act as the Bureau's director eliminates the independence that Congress has
required for that Bureau." Dkt. 22-1 at 1. That is not permissible under Dodd-Frank.[13]

Nor is it what Congress intended in enacting the FVRA. Congress "determined that some
positions with hallmarks of independence should not be filled on an acting basis through the
Vacancies Reform Act." OLC Memo at 7. The CFPB Director unquestionably has those
hallmarks, and defendants do not contend otherwise. One indication of the CFPB's Director's
independence is her service on the FDIC's multi-member board, which consists only of
independent financial regulators. Although defendants draw a distinction between service on that

---

[13] The defendants point out that the FVRA did not specifically carve out the CFPB from its
scope. True. But that's because the CFPB did not exist at the time. The FVRA excluded most
other independent financial agencies, the multimember commissions that predated the CFPB,
and there is no reason to think Congress would not have done the same for the CFPB had the
agency existed at the time of the FVRA.

board as a member directly appointed and service as a member appointed to a different position (*ex officio* members), this too misses the larger point: the reason *why* the FVRA does not reach independent, multi-member agencies—which is to preserve independence and to prevent statutory requirements of board members from being manipulated. Both of those concerns are implicated here. Amici professors of consumer-finance regulation makes this very point, *see* Dkt. 19-1 at 15-17, and defendants offer no rejoinder.

### E.    The Appointment Violates the Constitution's Appointments Clause

Defendants do not dispute that the president has only two constitutional means of appointing officers: with the advice and consent of the Senate, or pursuant to a statute. *See NLRB v. SW Gen.*, 137 S. Ct. 929, 945 (2017) (Thomas, J., concurring). "[A]ll persons who can be said to hold an office under the government . . . were intended to be included within one or the other of these modes of appointment." *United States v. Germaine*, 99 U.S. 508, 510 (1878). A president who appoints an officer without Senate confirmation or statutory authorization violates the Appointments Clause. *Id.*; *Williams v. Phillips*, 360 F. Supp. 1363, 1364, 1371 (D.D.C. 1973) (enjoining Acting Director of the Office of Economic Opportunity pursuant to Appointments Clause). Here, Mr. Trump appointed Mr. Mulvaney without Senate confirmation or statutory authorization; he therefore violated the Appointments Clause.

Rather than refute the main point, defendants suggest that acting directors may not be not subject to the Appointments Clause at all. This is an odd argument. The FVRA, which is all about acting directors, and on which defendants rely, was itself "framed as a reclamation of the Congress's Appointments Clause power." *SW Gen., Inc. v. NLRB*, 796 F.3d 67, 70 (D.C. Cir. 2015) (citing 144 Cong. Rec. S6413 (daily ed. June 16, 1998) (statement of Sen. Thompson) ("This legislation is needed to preserve one of the Senate's most important powers: the duty to advise and consent on presidential nominees.")); S. Rep. No. 105-250, at 5 (1998) ("If the

14

Constitution's separation of powers is to be maintained. . . legislation to address the deficiencies in the operation of the current Vacancies Act is necessary. . . . [T]he Senate's confirmation power is being undermined as never before.")).

In addition to the FVRA, there is certainly precedent for applying the Appointments Clause to the appointment of acting directors. In *Williams*, for example, the court held: "Unless Congress has vested the power of appointment of an officer in the President, the Courts, or a Department head, he may be appointed only with the advice and consent of the Senate." *Williams*, 360 F. Supp. at 1367-68. Because the president did not appoint the *Acting* Director of the Office of Economic Opportunity with Senate confirmation or pursuant to statute, the court enjoined the defendant from "taking any actions as Acting Director." *Id*. at 1371.

The same is true here.

### F.     Plaintiff's Claims Are Not Barred by the *Quo Warranto* Doctrine, and This Court has Authority to Issue Injunctive Relief

Unable to escape the plain language of a mandatory statute they continue to violate, defendants throw the kitchen sink: (i) resurrecting the "feudal" *quo warranto* doctrine, *SW Gen., Inc.*, 796 F.3d at 81, and (ii) claiming that courts cannot stop the president from violating the law—an argument worthy of King George III. Neither argument survives in 2017.

### 1.     *Quo Warranto* Is No Defense Here

Defendants claim that a provision of D.C. law codifying the writ of *quo warranto* (D.C. Code § 16-3501) preempts all of plaintiff's otherwise applicable federal statutory and constitutional challenges by virtue of the common-law "*de facto* officer" doctrine.

Defendants are mistaken. Just two years ago, in a case almost procedurally identical to this one, the D.C. Circuit held that a bank regulated by the CFPB could challenge the constitutionality of the CFPB Director's appointment, even though the CFPB had taken no action

at all with respect to that bank. *See State Nat'l Bank of Big Spring v. Lew*, 795 F.3d 48, 54 (D.C. Cir. 2015). The so-called *quo warranto/de facto* officer doctrine posed no bar to the D.C. Circuit, and for good reason.

First, "the Supreme Court has limited the doctrine, declining to apply it when reviewing Appointments Clause challenges. . . and important statutory defects." *SW Gen.*, 796 F.3d at 81 (rejecting *quo warranto* doctrine); *id.* (doctrine is "cumbersome" and "could easily operate to deprive a plaintiff with an otherwise legitimate claim of the opportunity to have his case heard.") (internal quotation marks omitted); *Ryder v. United States*, 515 U.S. 177, 180 (1995) (rejecting *quo warranto* defense in Appointments Clause case). To the contrary, courts encourage prompt adjudication of a claim of "trespass" in the "executive power of appointment." *Id.* at 182. This is particularly so where, as here, the challenge implicates separation of powers and the need to prevent the Executive Branch from "aggrandizing its power at the expense of another branch." *Id.* at 182 (internal quotation marks omitted). "Any other rule," the Supreme Court has cautioned, "would create a disincentive" to challenge "questionable . . . appointments." *Id.* at 183.

Second, the D.C. Circuit has rejected the doctrine, instead permitting "collateral attacks on an official's authority . . . when two requirements are met": (1) "the plaintiff must bring his action at or around the time that the challenged government action is taken," and (2) "the plaintiff must show that the agency or department involved has had reasonable notice under all the circumstances of the claimed defect in the official's title to office." *SW Gen.*, 796 F.3d at 81-82 (internal quotation marks omitted). Both requirements are easily satisfied here. Plaintiff (1) brought this action within weeks of Mr. Mulvaney' illegal takeover, and (2) gave defendants notice at the same time, and they "do[] not challenge the adequacy of this notice." *Id.* at 82; *see*

*Andrade v. Regnery*, 824 F.2d 1253, 1256 (D.C. Cir. 1987) ("The filing of the underlying suit . . . in and of itself notified the government of appellants' . . . challenge."). Defendants do not even attempt to contest that plaintiff easily meets these two requirements. The *quo warranto* argument is not only "oft-forgotten" and "feudal"; in this case it is frivolous. *SW Gen.*, 796 F.3d at 82.

### 2.    The President Is Not Above the Law

Defendants next claim that federal courts have no jurisdiction to enjoin the president from violating the law. Def. Br. 36. In defendants' view, apparently, if Donald Trump issued an executive order deporting all Muslims, shutting down all "fake news" outlets, or imprisoning his political rivals, no court would have the power to stop him. This is an ugly view of unchecked presidential power, expressed famously by Richard Nixon ("When the president does it, that means that it is not illegal")[14], and more recently, by Mr. Trump' personal lawyer ("The President cannot obstruct justice because he is the chief law enforcement officer").[15] Thankfully, Nixon and Trump are gravely mistaken.

The Supreme Court has "long held that when the President takes official action, the Court[s] ha[ve] the authority to determine whether he has acted within the law." *Clinton v. Jones*, 520 U.S. 681, 703 (1997). Courts have the power to restrain unconstitutional presidential action. *See, e.g.*, *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 584 (1952); *Berry v. Reagan*, No. 83-3182, 1983 WL 538 (D.D.C. Nov. 14, 1983) (enjoining President Reagan in the specific context of the president's power over inferior officers); *Mackie v. Bush*, 809 F. Supp. 144, 148

---

[14] Divine Anger, *Nixon When the president does it, that means that it is not illegal*, YouTube, Jun. 18, 2013, https://www.youtube.com/watch?v=HiHN3IJ_j8A.

[15] Mike Allen, *Exclusive: Trump lawyer claims the "President cannot obstruct justice,"* Axios (Dec. 4, 2017), https://www.axios.com/exclusive-trump-lawyer-claims-the-president-cannot-obstruct-justice-2514742663.html.

(D.D.C. 1993), *vacated as moot sub nom.*, *Mackie v. Clinton,* 10 F.3d 13 (D.C. Cir. 1993) (same, enjoining President George Bush).

"[I]n most cases" courts can issue such relief "against subordinate officials," obviating the need for relief against the President. *Swan v. Clinton*, 100 F.3d 973, 978 (D.C. Cir. 1996). That is what happened in *Youngstown*, for example, when the Court invalidated President Truman's "order directing the Secretary of Commerce to take possession of and operate most of the Nation's steel mills." 343 U.S. at 582. "Although the President was not a party, the Court enjoined the Secretary of Commerce from executing a direct Presidential order," *Nixon v. Fitzgerald*, 457 U.S. 731, 754 n.36 (1982), and thus "understood its [opinion] effectively to restrain the president," *Nat'l Treasury Emps. Union v. Nixon*, 492 F.2d 587, 611 (D.C. Cir. 1974) ("*NTEU*"); *see also Clinton*, 520 U.S. at 703 ("[W]e exercised our Article III jurisdiction to decide whether [the President's] official conduct conformed to the law.").

In this case, the president is not the sole defendant, and plaintiff's injury may be at least partially remedied by an injunction against Mr. Mulvaney. But "only injunctive relief against the President himself," *Swan*, 100 F.3d at 979, will afford full relief, as the president could illegally attempt to appoint another Acting Director under the FVRA. The power to appoint the head of an agency belongs uniquely to the president, and so an injunction against the president himself is appropriate and necessary.

"[I]t would be exalting form over substance if the President's acts were held to be beyond the reach of judicial scrutiny when he himself is the defendant, but held within judicial control" when "federal officials subordinate to the President . . . can be named as a defendant." *NTEU*, 492 F.2d at 613-15 (allowing case against the President to proceed where "no federal official other than the President [could] be properly named as defendant"). If this Court has the power to

18

enjoin unlawful, injurious exercises of the executive power, it has the power to enjoin whichever federal officials must be enjoined to vindicate the Constitution. *See Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 170 (1803) ("It is not by the office of the person to whom the writ is directed, but the nature of the thing to be done that the propriety or impropriety of issuing a mandamus, is to be determined."). A highly formalistic distinction that uniquely immunizes the president from judicial power would thus ignore (or effectively nullify) the "settled law" that federal courts are not precluded from "exercis[ing] jurisdiction over the President." *Fitzgerald*, 457 U.S. at 753-54 (listing examples); *see Boumediene v. Bush*, 553 U.S. 723 (2008) (habeas corpus); *Clinton v. City of New York*, 524 U.S. 417 (1998) (declaratory relief); *United States v. Nixon*, 418 U.S. 683 (1974) (subpoena); *United States v. Burr*, 25 F. Cas. 187 (No. 14,694) (Cir. Ct. D. Va. 1807) (Marshall, C.J.) (subpoena); *see also generally* Jonathan Siegel, *Suing the President: Nonstatutory Review Revisited*, 97 Colum. L. Rev. 1612 (1997).[16]

Courts have enjoined other presidents. Courts can enjoin this one.

---

[16] As many scholars and courts have recognized, *Mississippi v. Johnson*, 71 U.S. 475 (1866), upon which defendants principally rely, was a political question case that arose before the modern terminology of political questions jurisprudence. *See NTEU*, 492 F.2d at 614; *Mississippi v. Johnson*, 71 U.S. at 500-01; *see also* Jerry Mashaw, *Federal Administration and Administrative Law in the Gilded Age*, 119 Yale L.J. 1362, 1401 n.123 (2010) ("*Mississippi v. Johnson* was, in essence, a political question case.").

## II.   THE CREDIT UNION HAS STANDING[17]

The Credit Union is regulated by the CFPB. It has standing. *See infra* § II(A). Acting illegally, Mr. Mulvaney has also made a number of harmful changes to CFPB rules and practices to which plaintiff objects, including his decision last week to neuter a crucial CFPB rule the Credit Union must follow concerning mortgage disclosures. Mr. Mulvaney's actions in his short time in office have already harmed the Credit Union, harmed its ability to plan for future compliance, and harmed its mission of improving the financial health of underserved communities. Plaintiff has standing for these reasons as well. *See infra* § II(B). The Credit Union need not await yet further unlawful action before bringing this challenge.

### A.   The Credit Union Is Regulated by the CFPB; It "Therefore Has Standing"

Because the Credit Union is regulated by the CFPB, it has standing to challenge Mr. Mulvaney's appointment. The D.C. Circuit reached this exact result in *State National Bank*, 795 F.3d 48. "There is no doubt that the Bank is regulated by the Bureau. Under *Lujan,* the Bank therefore has standing to challenge the constitutionality of the Bureau," as well as the appointment of the CFPB Director. *Id.* at 53 (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561-62 (1992)). Just so here.

---

[17] Defendants claim, in a footnote, that Plaintiffs have no "valid cause of action." Def. Br. 15 n.2. "Arguments which appear in footnotes are generally deemed to have been waived." *In re Crude Oil Commodity Litig.*, No. 06 Civ. 6677, 2007 WL 2589482, at *3 (S.D.N.Y. Sept. 7, 2007); *see also Beechwood Restorative Care Ctr. v. Leeds*, 436 F.3d 147, 154 n.3 (2d Cir. 2006) ("defense is considered waived since it only appears in a footnote"); *United States v. Restrepo*, 986 F.2d 1462, 1463 (2d Cir. 1993) ("We do not consider an argument mentioned only in a footnote to be adequately raised or preserved for appellate review."). Nor should Defendants be permitted to "salvage their motion[] . . . by raising new arguments or claims in a reply brief." *Cohain v. Klimley*, No. 08 CIV. 5047 PGG, 2011 WL 3896095, at *5 (S.D.N.Y. Aug. 31, 2011) (Gardephe, J.). Plaintiff properly alleged claims under the APA, Declaratory Judgment Act and U.S. Constitution as well as the Court's inherent power to "enjoin unconstitutional actions by state and federal officers." *Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1384 (2015). That defendants relegate this argument to a single footnote in a brief with a 50-page limit speaks volumes to its merit.

"The Supreme Court has stated that 'there is ordinarily little question' that a regulated individual or entity has standing to challenge an allegedly illegal statute or rule under which it is regulated." *Id.* (quoting *Lujan*, 504 U.S. at 561-62). *Lujan* distinguished an entity regulated by the government, which "ordinarily" has standing, and an entity "not [itself] the object of the government action or inaction [it] challenges," where standing is "substantially more difficult" to prove. *Lujan*, 504 U.S. at 562 (internal quotation marks omitted). As the D.C. Circuit explained, the "Bank is not a mere outsider asserting a constitutional objection to the Bureau. The Bank is regulated by the [CFPB]." *State Nat'l Bank*, 795 F.3d at 53. That is this case.

The Credit Union is no "mere outsider" objecting to Mr. Mulvaney's unlawful appointment. *Id.* The Credit Union is "regulated by the [CFPB]." *Id.* The Credit Union has put forth unrebutted evidence that it must comply, *inter alia*, with the CFPB's rules regulating the Credit Union's mortgage disclosures to applicants, determination of an applicant's ability to repay a mortgage, collecting and reporting of mortgage data, and international money transfers (remittances). Dkt. 10-3 ("Levy Initial Decl.") ¶¶ 6-10. It incurs compliance costs to adhere to the CFPB's rules. *Id.*; Levy Supplement Declaration, Dec. 29, 2017 ("Levy Supp. Decl.") ¶¶ 6, 17-19. Under *State Bank* and *Lujan*, the Credit "therefore has standing." *State Nat'l Bank* , 795 F.3d at 53.

Plaintiff need establish no additional evidence of harm. *Cf.* Def. Br. 10. Regulated entities are "directly harmed by unconstitutional appointments" because, "under the Constitution and laws of the United States, [the bank] is subject to regulation *only* by individuals with legal authority to act." *Olympic Fed. Savs. & Loan Ass'n v. Dir., Office of Thrift Supervision*, 732 F. Supp. 1183, 1188-89 (D.D.C. 1990) (emphasis in original) (injunctive relief granted was

rendered moot by the subsequent, constitutional appointment of the OTS Director), *appeal dismissed and remanded*, 903 F.2d 837 (D.C. Cir. 1990).

Defendants' argument cannot be squared with the D.C. Circuit's opinion in *State National Bank*. Both cases were brought by small financial institutions regulated by the CFPB. Both cases challenge the appointment of the CFPB head. Both cases are pre-enforcement challenges.[18] And both cases argue that a regulated entity has a right not to be governed by an *ultra vires* agency director.

Defendants misread *State National Bank* as holding that a regulated entity must provide specific regulatory compliance costs to establish standing. That is incorrect.[19] The holding is plain: "There is no doubt that the Bank is regulated by the Bureau. Under *Lujan*, the Bank therefore has standing." 795 F.3d at 53. In addition, the bank there did not have to comply with the only rule or regulation cited: the Remittance Rule. The bank fell within the safe harbor to that rule and merely "alleged that it must now monitor its remittances to stay within the safe harbor." *Id.*[20] This was not the basis for finding standing in that case.

---

[18] The D.C. Circuit recognized that the Bank was "challenging the legality of the regulating agency itself," instead of the "usual" case "challenging an agency rule." *State Nat'l Bank*, 795 F.3d at 54. But the analysis was the same: a regulated entity should not have to "violate a law (and thereby trigger an enforcement action against it) simply so that the regulated entity can challenge the constitutionality of the regulating agency." *Id.*

[19] In any event, the Credit Union has shown specific harm here, *see* Levy Initial Decl. and *infra* § II(B).

[20] The Bank could not point to any CFPB regulation that controlled its activities. It could point only to rules that *might* apply, such as the remittance (international wire transfers) rule which would govern the Bank if it exceeded the 100 transfers annually "safe harbor." *See State Nat'l Bank*, 795 F.3d at 53 (citing Electronic Fund Transfers (Regulation E), 77 FR 50244-01). For that reason, its so-called "compliance costs" were actually monitoring costs, "voluntarily incurred to keep track of the CFPB's activities, not to actually comply with any regulations." *State Nat'l Bank of Big Spring v. Lew*, 958 F. Supp. 2d 127, 152 (D.D.C. 2013), *aff'd in part, rev'd in part*, 795 F.3d 48 (D.C. Cir. 2015).

Defendants next ask the Court to ignore *State National Bank*'s holding, citing *John Doe Co. v. Consumer Fin. Prot. Bureau*, 849 F.3d 1129 (D.C. Cir. 2017), a short *per curiam* order denying an emergency motion for injunction pending appeal. Defendants misread *John Doe* in multiple ways. First, the short order was grounded in its procedural posture, arising as an emergency motion for injunction pending appeal, with a deferential "abuse of discretion" standard of review. *Id.* at 1135. Second, plaintiff did not raise its constitutional claim in the "proper forum," the California district court where "the enforcement action [was] pending." *Id.* at 1134. The D.C. Circuit recognized that it would be a different case if denying standing would "'foreclose all meaningful judicial review,'" as it would here, where plaintiff has no other forum. *Id.* (quoting *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 489 (2010)).

Third, *John Doe* distinguished *National Bank* because unlike the plaintiff in National Bank, the John Doe bank did not "object to any other regulatory measure taken by the Bureau." *Id.* at 1132 n.1. In contrast, the Credit Union objects to a host of regulatory measures taken by the CFPB under Mr. Mulvaney's leadership. Levy Supp. Decl. ¶ 29. The Supreme Court does not require a plaintiff bringing a general challenge to an agency's authority to sit back and await "a future enforcement action." *State Nat'l Bank,* 795 F.3d at 53-54. Nor must the Credit Union "select and challenge a Board rule at random." *Free Enter. Fund*, 561 U.S. at 490 (Plaintiff's "general challenge. . . is 'collateral' to any [agency] orders or rules from which review might be sought."). This action can and should be resolved now.

Finally, *John Doe* was a 2-1 decision over a strenuous dissent unmentioned by defendants. The dissenting judge, Judge Kavanaugh, made clear that black-letter law provides for standing in exactly these circumstances: "Under the Supreme Court's and this Court's precedents, the Company as a regulated entity has standing to raise its free-standing

constitutional claim." *John Doe*, 849 F.3d at 1135 (Kavanaugh, J., dissenting). The John Doe bank was harmed by being "regulated on an ongoing basis by an unconstitutional agency," and a "preliminary injunction would alleviate that ongoing harm." *Id.* at 1137; *see also id.* at 1136 ("Irreparable harm occurs almost by definition when a person or entity demonstrates a likelihood that it is being regulated on an ongoing basis by an unconstitutionally structured agency that has issued binding rules governing the plaintiff's conduct."). As detailed above, the majority did not explicitly disagree with this analysis, but rather did not issue an emergency stay given the unique procedural posture.

At bottom, defendants ask this Court to reject the position of at least four D.C. Circuit judges applying Supreme Court case law that a regulated entity necessarily has standing to challenge the legality of its regulator. The basic three-part test of standing—an injury, traceable to defendants, redressable by the Court—is easily met: plaintiff is injured by "be[ing] regulated on an ongoing basis by an unconstitutional[ly run] agency," directly traceable to defendants' unlawful takeover of the Bureau. *Id.* at 1137. A preliminary injunction would remedy that ongoing injury. Plaintiff has standing.

### B.    The Credit Union Also Has Standing Because it Objects to and is Harmed by Mr. Mulvaney's Actions at the CFPB

The Credit Union also has standing because it "object[s] to other regulatory measure[s]" taken by its regulator without lawful authority. *John Doe*, 849 F.3d at 1132 n.1. Since Mr. Mulvaney's appointment last month, the CFPB has announced changes to Home Mortgage Disclosure Act (HMDA) compliance and to and the prepaid debit card rule, retreated from

important enforcement activities, and placed a freeze on certain new agency actions.[21] Plaintiff objects to all of these regulatory changes.

Focusing on the HMDA changes, HMDA requires financial institutions including the Credit Union to collect and disclose information about mortgages they issue. HMDA was enacted to combat "redlining" by requiring financial institutions to "provide citizens and public officials with 'sufficient information to enable them to determine whether depository institutions are filling their obligations to serve the housing needs of [their local] communities.'" *Nat'l State Bank, Elizabeth, N. J. v. Long*, 469 F. Supp. 1068, 1070 (D.N.J. 1979) (quoting 12 U.S.C. § 2801(b)).

Last week, the CFPB effectively gutted HMDA by removing any penalties for non-compliance with HMDA rules and not requiring correction of so-called immaterial errors in reported data; it also intends to revise certain HMDA rules scheduled for January 1, 2018. Levy Supp. Decl. ¶¶ 3-6 & Exs. A, B. Because compliance imposes costs, the necessary result of removing any penalty for non-compliance is that rates of errors and even wholesale non-compliance will increase, and HMDA data will cease being reliable. *Id.*

Accurate HMDA data is important to level the playing field amount mortgage issuers. Levy Suppl. Decl. ¶ 8. HMDA holds financial institutions accountable to issue home mortgages

---

[21] Defendants' claim that Plaintiff must separately establish standing to challenge each objectionable conduct by Mulvaney has been squarely rejected. In *State National Bank*, on remand, the government claimed that because the Credit Union only incurred costs to comply with the Remittances Rule, it lacked standing to invalidate any other regulation enacted by the director Cordray. The D.C. district court rejected that analysis: because plaintiffs are "not seeking to directly 'invalidate' any regulations, as if this were a run-of-the-mill APA challenge," but are instead challenging the Director's very appointment as unconstitutional, the "compliance costs under the Remittance Rule create standing to challenge the recess appointment," without the need to consider Plaintiff's injury and redressability as to each rule. *State Nat'l Bank of Big Spring v. Lew,* 197 F. Supp. 3d 177, 181 (D.D.C. 2016). Just so here.

on fair terms and not discriminate by neighborhood (i.e. redlining) or because of the applicant's race or national origin. *Id.* ¶ 7.

Though defendants argue that the Credit Union must point to a "pocketbook" injury, there is no requirement that regulated entities must desire *less burdensome* regulations. Indeed, it is common that even for-profit regulated entities desire *additional* regulation to hold all players in an industry accountable and level the playing field.[22] *Id.* ¶ 8. It cannot be that a regulated entity only has standing to challenge the *imposition* of a regulation but not the objectionable *withdrawal* of that same regulation. That is doubly true here, because the Credit Union is a non-profit entity which exists not to maximize its bottom line, but to serve its corporate mission of improving economic opportunity in NYC neighborhoods and underserved communities. Levy Initial Decl. ¶¶ 3-5; *see also* Mov. Br. 20-21 & *infra* § III(C) (citing cases recognizing that non-profits are harmed where their mission is frustrated).

Nevertheless, the Credit Union *will* suffer a "pocketbook" injury as a result of the CFPB's decision to effectively gut the HMDA rules. As detailed in the attached Levy Supplemental Declaration, banks make monetary deposits at low or no interest with community development credit unions, like the Credit Union, to meet their community investment obligations pursuant to a separate federal statute, the Community Reinvestment Act ("CRA"). Levy Supp. Decl. ¶¶ 10-16. Because the Credit Union serves the local community, such deposits indicate that the bank is "meeting the credit needs of the entire community," consistent with the CRA. *Nat'l State Bank*, 469 F. Supp. at 1071 (describing CRA requirements). The Credit Union currently has $2.5 million in such bank non-member deposits that it uses to issue loans to its

---

[22] *See* Symposium, *Freedom of the Press*, 127 Harv. L. Rev. 2234, 2251 (2014) (describing contexts in which corporations may prefer to operate under more stringent regulations); James W. Coleman, *How Cheap is Corporate Talk? Comparing Companies' Comments on Regulations With Their Securities Disclosures*, 40 Harv. Envtl. L. Rev. 47, 52 n.13 (2016) (same).

members. *Id.* ¶ 12. In examining banks for CRA compliance, regulators rely on accurate HMDA data, among other data. *Id.* ¶ 11. If financial institutions know there is no penalty for producing inaccurate data—as the CFPB has now promised—they can misrepresent their HMDA data with impunity, appear to comply with the CRA, and have little incentive to invest more in community financial institutions like the Credit Union to comply with the CRA. *Id.* ¶ 15. Without the non-member bank's deposits, the Credit Union's business model will suffer. *Id.*

The Credit Union is further injured by the uncertainty resulting from the CFPB's statement last week that it "intends to engage in a rulemaking to reconsider various aspects of the 2015 HMDA Rule." Levy Suppl. Decl. ¶¶ 5, 18-20 & Ex. A. Coupled with the CFPB's effective decision not to enforce any HMDA regulations, the Credit Union does not know whether the 2015 HMDA rule will remain in effect, whether it will be revised, and whether it should comply in the interim. *Id.* ¶ 19. The Credit Union has spent considerable time and resources to evaluate and ensure compliance with the CFPB's 2015 HMDA rule, which expands the types of data that financial institutions must collect beginning on January 1, 2018. But in the face of the CFPB's statements, the Credit Union is unable to engage in long-range planning about what HMDA disclosures it will have to make. It now has to invest further resources into considering various potential revisions to the HMDA disclosures and planning for the disclosure obligations in each scenario, without knowing whether it will need to comply at all. Levy Supp. Decl. ¶ 20. As the Credit Union's CEO put it: "The Credit Union is unable to engage in long-range planning about what HMDA disclosures it will have to make. The Credit Union will have to invest further resources *now* to plan for its alternative disclosure obligations depending on Mr. Mulvaney's various potential revisions to HMDA. For the Credit Union, this is wasteful, time-consuming,

27

and a direct result of the actions Mr. Mulvaney has taken since he seized power at the CFPB." *Id.* ¶ 19.

Courts have repeatedly held that a regulated business has standing to challenge an agency action that precludes "long-range economic planning." *Great Lakes Gas Transmission Ltd. P'ship v. FERC*, 984 F.2d 426, 431 (D.C. Cir. 1993) (standing established although agency's order would only injure plaintiff if third party later failed to act, because "to find otherwise would ignore the reality of the long-range economic planning involved in the sound management of an enterprise"); *Rio Grande Pipeline Co. v. FERC*, 178 F.3d 533, 540 (D.C. Cir. 1999) (standing to challenge agency decision not to immunize current rates from third-party protest, though no protest was imminent, because of effect on plaintiff's "present economic behavior— investment plans and creditworthiness—and its future business relationships"); *United States v. Storer Broad. Co.*, 351 U.S. 192, 200 (1956) (regulated entity has standing because it "cannot cogently plan its present or future operations"). None of defendants' cases involved an agency *affirmatively stating* that it would be rewriting a rule plaintiff must obey. *Cf. New Eng. Power Generators Ass'n, Inc. v. FERC*, 707 F.3d 364, 369 (D.C. Cir. 2013) (standing requires "more than the possibility an agency may one day reverse its position"), *cited in* Def. Br. 11-12.[23]

---

[23] Nor must plaintiff establish that these harms would not occur should a new Director be appointed by the President and confirmed by Congress as Defendants claim. The Credit Union need not prove what the CFPB's "policies might have been in that counterfactual world." *Free Enter. Fund v. Public Co. Accounting Oversight Bd.,* 561 U.S. 477, 512 n.12 (2010); *see also Comm. for Monetary Reform v. Bd. of Govs. Of Fed. Reserve Sys.,* 766 F.2d 538, 543 (D.C. 1985) ("[A] party is not required to show that he has received less favorable treatment than he would have if the agency were lawfully constituted and otherwise authorized to discharge its functions.").

### III.   THE CREDIT UNION WILL BE IRREPARABLY HARMED ABSENT AN INJUNCTION

#### A.   Defendants Ask this Court to Ignore Binding Authority that Violations of Constitutional Rights are *Per Se* Irreparable

As the Second Circuit has held repeatedly, where there is an alleged constitutional violation, there is *per se* irreparable harm. *See* Mov. Br. 17-18 (citing *Statharos v. N.Y. City Taxi & Limousine Comm'n*, 198 F.3d 317, 322 (2d Cir. 1999); *Conn. Dep't of Envtl. Prot. v. O.S.H.A.*, 356 F.3d 226, 231 (2d Cir. 2004); *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996)). Defendants ask this Court to ignore all these cases, claiming they apply only to violations of so-called "personal constitutional rights," not "violations of the Constitution that establish the structure of the Government." Def. Br. 37-38. They cite no case in the Second Circuit supporting such a distinction. This Court is bound to follow this Circuit's precedent, not two outlier cases from outside this Circuit that defendants located. *See also* 11A Wright & Miller, Federal Practice & Procedure § 2948.1 (3d ed.) ("When an alleged deprivation of a constitutional right is involved . . . most courts hold that no further showing of irreparable injury is necessary.").[24]

This artificial distinction is also inconsistent with Second Circuit precedent. For example, a regulated entity's right to be free from *ultra vires* regulation is no less "personal" than a corporation's right to be free from the City's taxi commission financial disclosure rules. Yet in the taxi case, the Second Circuit presumed irreparable injury as a result of the alleged constitutional violation. *Statharos*, 198 F.3d at 322.

---

[24] While Defendants rely on *Latino Officers Ass'n v. Safir*, 170 F.3d 167, 171 (2d Cir. 1999), to claim that irreparable harm must be demonstrated in constitutional cases, the Second Circuit later clarified that *Latino Officers* stands only for the proposition that where "a plaintiff alleges injury from a rule or regulation that directly limits speech, the irreparable nature of the harm may be presumed." *Bronx Household of Faith v. Bd. of Educ. of City of N.Y.*, 331 F.3d 342, 349 (2d Cir. 2003).

29

**B.**     **Regulation by an *Ultra Vires* Acting Director Causes Irreparable Harm**

Defendants admit that Mr. Mulvaney is "already directing agency policy" and has already made "decisions" that could be "upend[ed]." Def. Br. 41. In short, Mr. Trump illegally appointed an Acting Director and is now making decisions on the ground that will be difficult to "upend." By their own admission, defendants are every day creating irreparable harm. That is their intent. At some point, the harm will be so irreparable that (in their view) the balance of the equities requires acceding to the "status quo."[25]

But might does not make right. Seizing the CFPB post, radically changing the status quo, then claiming that passage of time defeats the motion, is the *very definition* of irreparable harm. No money damage award can undo this harm.

The violation of plaintiff's right to be regulated only by a government agency acting with lawful authority is an injury that can never be later remedied. *See Olympic Fed. Sav. & Loan Ass'n*, 732 F. Supp. at 1188 (regulated entities asserting appointments clause challenge suffer an "injury . . . . when its government acts unconstitutionally against it"); *John Doe Co.*, 849 F.3d at 1136 (Kavanaugh, J., dissenting) ("Irreparable harm occurs almost by definition when a person or entity demonstrates a likelihood that it is being regulated on an ongoing basis by an unconstitutionally structured agency that has issued binding rules governing the plaintiff's conduct.").

This is sufficient to establish irreparable harm. It would be absurd to wait for Mr. Mulvaney to dig a regulatory hole deeper and deeper, until some magical amount of irreparable harm is reached. In any event, Mr. Mulvaney has already dug a pretty deep hole for the Credit Union. *See supra* § II(B) & Levy Supp. Decl. ¶¶ 28-29. Mr. Mulvaney effectively gutted HMDA

---

[25] This is, no doubt, why defense counsel proposed a briefing schedule well into February. Dkt. 12 at 4. The longer Mr. Mulvaney seizes power, the harder it is to undo the harm.

regulations, harming plaintiff's business model. Without access to accurate HMDA data, the Credit Union will lose a crucial tool used to advocate that banks comply with their CRA obligations by (i) making further deposits with the Credit Union and (ii) retaining the $2.5 million in deposits they have already made. Levy Supp. Decl. ¶ 15. No subsequent remedy can repair this harm.

The CFPB announced it "intends to engage in a rulemaking to reconsider various aspects of the 2015 HMDA Rule," requiring the Credit Union to invest further time and resources *now* to plan for its alternative disclosure obligations depending on Mr. Mulvaney's various potential revisions to the HMDA. Levy Supp. Decl. ¶¶ 19-20 & Ex. A. For the Credit Union, this is wasteful, time-consuming, and a direct result of the actions Mr. Mulvaney has taken since he seized power at the CFPB. *Id.*

### C.    Defendants' Frustration of the Credit Union's Mission Also Causes Irreparable Harm

Mr. Mulvaney's actions also frustrate the Credit Union's mission. As defendants concede, frustrating an organization's mission establishes irreparable harm. Def. Br. 40; *see* Mov. Br. 20-21 (collecting cases).[26] Mr. Mulvaney has done so in multiple ways. He gutted the HMDA rules, harming the Credit Union's mission of promoting economic justice and serving financially underserved communities. Levy Supp. Decl. ¶¶ 21-24. Decimating the HMDA permits banks to ignore the impact of unfair lending practices—such as redlining and targeting

---

[26] The Second Circuit has also found that non-profits have standing to challenge government action that "has impeded, and will continue to impede, the organization's ability to carry out [its] responsibility." *N.Y. Civil Liberties Union v. N.Y. City Transit Auth.*, 684 F.3d 286, 295 (2d Cir. 2012); *see also Nnebe v. Daus*, 644 F.3d 147, 157 (2d Cir. 2011) ("[O]nly a perceptible impairment of an organization's activities is necessary for there to be an injury in fact.") (internal quotation marks omitted). Defendants cite only inapplicable cases where the plaintiffs alleged "no injury to themselves as organizations." *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 40 (1976).

borrowers of color for sub-prime loans—on local communities. *Id.* The Credit Union's mission

is harmed where banks and other financial institutions are not held accountable to serve their

communities. When banks issue unfair or discriminatory mortgages to low-income communities

in New York City, that directly undermines the work the Credit Union does to invest in the

financial stability of those communities and its members.

Mr. Mulvaney delayed the enactment of a rule governing prepaid debit cards, lowering

the quality of financial products available to underserved communities. Credit Union members

are among those paid by their employers using these cards. *Id.* ¶ 27. Mr. Mulvaney froze new

CFPB enforcement actions and regulations, while also retreating from the CFPB's prior positions

in enforcement actions.[27] Mov. Br. 21. He announced a hiring freeze at the CFPB, instead

appointing people with no experience in overseeing financial institutions or protecting

consumers—and the list goes on. Levy Supp. Decl. ¶ 28.

Mr. Mulvaney has described the CFPB as a "sad, sick joke," "would advocate shutting it

down," and now intends to "limit as much as we can what the CFPB does." Mov. Br. 20-21. The

CFPB's mission to protect consumers and improve financial markets furthers the Credit Union's

mission to improve financial opportunities for underserved communities. *Id.* All of that is now at

risk, and will continue to be until Mr. Mulvaney is removed from this unlawful appointment.

---

[27] *See, e.g.,* Minute Order, *Nexus Servs. Inc. v. Consumer Fin. Prot. Bureau*, No. 17 Civ. 02215 (S.D.N.Y. Dec. 4, 2017) (CFPB agreed to suspend enforcement of investigative demand on company accused of preying on immigrant detainees); Jessica Silver-Greenberg and Stacy Cowley, *Consumer Bureau's New Leader Steers a Sudden Reversal*, N.Y. Times (Dec. 5, 2017), https://www.nytimes.com/2017/12/05/business/cfpb-mick-mulvaney.html?_r=0 (despite press reports that the CFPB was planning to sue Santander Bank over allegedly deceptive auto loan policies, since Mulvaney's appointment no such lawsuit has been filed).

## IV.     THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST SUPPORT PLAINTIFF

Defendants claim that granting an injunction would upset the "consensus view that Mr. Mulvaney should be recognized as the Acting Director." Def. Br. 41. But no consensus view supports defendants. The actual Acting Director (Ms. English) is suing defendants, and numerous amici filed in support of plaintiff, including the chief architects of the Act, Senator Dodd and Representative Frank. Defendants fail to acknowledge or respond to:

- The brief by sponsors and drafters of Dodd-Frank, who state flatly that Dodd-Frank requires the Deputy Director to become CFPB Acting Director. *See* Dkt. 14-1.

- The brief by 17 States and the District of Columbia arguing that the mandatory successor language in Dodd-Frank is an essential component of the independent structure at the heart of the CFPB statutory scheme. *See* Dkt. 24-1.

- The brief by Public Citizen and 8 other consumer groups noting that the public interest requires an injunction because the CFPB's independence is necessary to pursue its public mission. *See* Dkt. 18.

- The brief by Peter Conti-Brown describing how the precedent that the president is attempting to set in this case is an assault on norms of independence that are core parts of our nation's financial regulatory system. *See* Dkt. 22-1.

- The brief by 21 scholars of consumer financial regulation arguing that the appointment of Defendant Mulvaney in particular is a direct violation of Congress's intentions for the CFPB's independence. *See* Dkt. 19-1.

The equities do not support defendants. They seized power, ignoring Director Cordray's memo, ignoring the Deputy Director's accession to Acting Director, and disregarding Dodd-Frank. Then they tell this court it has no power to stop the illegal actions of a president.

Defendants claim an injunction would "delay agency business" and "interfere with the Bureau's execution of the nation's consumer protection laws." Def. Br. 41. This claim is hard to take seriously, from a defendant who by his own admission wants to eviscerate the Bureau. The only people interfering with the Bureau's execution of the nation's consumer protection laws are

Donald Trump and Michael Mulvaney—and the sooner Mr. Mulvaney is removed from his illegal post, the sooner the CFPB can get *back* to business.

As a result of self-help and an illegal takeover, today, a major, independent executive agency is run by a part-time, subservient, *ultra vires* director who opposes the agency's mission. The equities and the public interest are plain. The preliminary injunction motion should be granted.

<strong>CONCLUSION</strong>

Plaintiff's motion for a preliminary injunction should be granted, and the motion to dismiss denied.

New York, New York
December 29, 2017

Respectfully submitted,

_____/s/_____

Ilann M. Maazel
Debra L. Greenberger
EMERY CELLI BRICNKERHOFF
& ABADY LLP
600 Fifth Avenue, 10th floor
New York, New York 10024
Phone: (212) 763-5000
Fax: (212) 763-5001
*imaazel@ecbalaw.com*

*Attorneys for Plaintiff*