USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 2/1/18

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

LOWER EAST SIDE PEOPLE'S FEDERAL
CREDIT UNION, on behalf of itself and its
members,

                Plaintiff,

    - against –

DONALD JOHN TRUMP, in his official
capacity as President of the United States of
America; JOHN MICHAEL MULVANEY,
in his capacity as the person claiming to
be acting director of the Consumer Financial
Protection Bureau,

                Defendants.

**MEMORANDUM
OPINION & ORDER**

17 Civ. 9536 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

        In this action, Plaintiff Lower East Side People's Federal Credit Union – a non-profit financial cooperative regulated by the Consumer Financial Protection Bureau ("CFPB") – challenges the legality of President Trump's appointment of Defendant John Michael Mulvaney as Acting Director of the CFPB. (Cmplt. (Dkt. No. 1) ¶¶ 11-12, 14-15)

        Plaintiff contends that, under 12 U.S.C. § 5491(b)(5)(B), Leandra English – the Deputy Director of the CFPB – "is the only person permitted under the law to be the Acting Director." (Pltf. Br. (Dkt. No. 10-4) at 8, 29) Defendants argue that the President lawfully exercised his authority under the Federal Vacancies Reform Act of 1998 (the "FVRA"), 5 U.S.C. § 3345 et seq., in naming Mulvaney as Acting Director. (Def. Opp. (Dkt. No. 31) at 26)

        The Complaint was filed on December 5, 2017 (Cmplt. (Dkt. No. 1)), and Plaintiff moved for a preliminary injunction on December 12, 2017. (See Proposed Order to Show Cause for Preliminary Injunction (Dkt. No. 10-1)) Defendants have moved to dismiss

pursuant to Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6). (Def. Opp. (Dkt. No. 31)) Defendants argue that this action "fails at the outset because Plaintiff has not established Article III standing." (Id. at 12) Defendants contend that "[w]here, as here, a plaintiff does not seek relief from any regulatory burden that imposes costs the plaintiff would avoid if it prevailed, a plaintiff's mere status as a regulated entity does not satisfy the requirements of injury in fact, causation, and redressability." (Id.)

For the reasons stated below, Defendants' motion to dismiss will be granted, and Plaintiff's motion for a preliminary injunction will be denied as moot.

## BACKGROUND

### I. THE HISTORY OF THE CFPB AND THE INSTANT LEADERSHIP DISPUTE

The Dodd-Frank Act of 2010 ("Dodd-Frank") established the CFPB as "an independent bureau" to "regulate the offering and provision of consumer financial products or services under the Federal consumer financial laws." 12 U.S.C. § 5491(a). Under Dodd-Frank, the CFPB is headed by a Director appointed by the President, by and with the advice and consent of the Senate, for a term of five years. 12 U.S.C. § 5491(b)(1)-(2), (c)(1). The Director may be removed by the President, but only for "inefficiency, neglect of duty, or malfeasance in office." 12 U.S.C. § 5491(c)(3).

The Senate confirmed Richard Cordray as the first Director of the CFPB on July 16, 2013, and he took office on July 17, 2013. (Cmplt. (Dkt. No. 1) ¶ 29) On November 17, 2017 – four years into his five-year term – Director Cordray announced that he would resign by the end of the month. See Renae Merle, Richard Cordray Is Stepping Down as Head of Consumer Financial Protection Bureau, Wash. Post (November 15, 2017),

2

https://www.washingtonpost.com/news/business/wp/2017/11/15/richard-cordray-is-stepping-down-as-head-of-consumer-financial-protection-bureau/?utm_term=.197172ea17be.

On November 24, 2017, Director Cordray appointed Leandra English – his chief of staff – to serve as Deputy Director of the CFPB. (Cmplt. (Dkt. No. 1) ¶ 31) Cordray then resigned, effective at midnight. (Id. ¶ 30) In appointing English as Deputy Director, Cordray intended to ensure that she would become Acting Director upon his resignation, pursuant to 12 U.S.C. § 5491(b)(5). (Id. ¶ 32 ("'In considering how to ensure an orderly succession for this independent agency,' Director Cordray explained in a statement, 'I have also come to recognize that appointing the current chief of staff to the deputy director position would minimize operational disruption and provide for a smooth transition given her operational expertise.'"))

On the day Cordray resigned, the President issued a memorandum designating Mulvaney as Acting Director of the CFPB:

> Pursuant to the Constitution and the laws of the United States, including section 3345(a) of title 5, United States Code, you are directed to perform the functions and duties of the office of Director, Bureau of Consumer Financial Protection, until the position is filled by appointment or subsequent delegation, effective 12:01 a.m. eastern standard time, November 25, 2017.

(Takemoto Decl., Ex. 1 (Nov. 24, 2017 Memorandum) (Dkt. No. 32-1) at 2)

On November 25, 2017, Mary McLeod – the CFPB's general counsel – issued a memorandum to the agency's Senior Leadership Team "advis[ing] all Bureau personnel to act consistently with the understanding that Director Mulvaney is the Acting Director of the CFPB." (Takemoto Decl., Ex. 3 (Nov. 25, 2017 Memorandum from CFPB general counsel) (Dkt. No. 32-3) at 2) McLeod's memorandum expresses the "legal opinion that the President possesses the authority to designate an Acting Director for the Bureau under the FVRA, notwithstanding [12 U.S.C.] § 5491(b)(5)." (Id. at 4) On November 26, 2017, Kate Fulton – the CFPB's Deputy

3

Chief of Staff and Acting Executive Secretary – convened a telephone call with senior CFPB leadership, during which "each of the Associate Directors stated that they would act consistently with the understanding that Mick Mulvaney was the Acting Director of the Bureau." (Fulton Decl. (Dkt. No. 32-4) ¶¶ 2, 6)

On November 27, 2017, Mulvaney arrived at CFPB headquarters and presented himself as the Acting Director. (Id. ¶ 7) Mulvaney was given access to the building and the Director's office and began work as Acting Director. (Id.) Since that time, Mulvaney has functioned as the CFPB's Acting Director. (Id. ¶¶ 8-10)

## II.   THE CFPB'S REGULATION OF PLAINTIFF

Plaintiff is a New York City-based non-profit credit union owned by its members, the majority of whom are low-income and immigrants. (Levy Decl. (Dkt. No. 10-3) ¶¶ 3-4) Plaintiff's corporate mission is to "promote economic justice and opportunity in NYC neighborhoods," and provide "high-quality financial services and community development investments in low income, immigrant and other underserved communities." (Id. ¶ 5) Plaintiff offers savings and checking account services, credit cards, consumer home mortgages, and small business and real estate loans. (Id. ¶ 4) Over time, Plaintiff has made approximately $100 million in housing, small business, and consumer loans. (Id. ¶ 3)

As a credit union, Plaintiff is subject to the CFPB's rulemaking authority and must comply with all CFPB rules. (Id. ¶ 6) For example, Plaintiff must comply with CFPB rules requiring it to (1) make certain disclosures to members seeking home mortgages; (2) make a reasonable, good faith determination of a consumer's ability to repay a mortgage; (3) comply with certain provisions of the Home Mortgage Disclosure Act ("HMDA") for the collection, recording, reporting, and disclosure of mortgage lending information; and (4) provide members

with disclosures about fees and exchange rates associated with transfers of money abroad. (Id. ¶¶ 7-10)

Linda Levy – Plaintiff's chief executive officer – states in a declaration that Plaintiff "does not know if, or for how much longer, existing CFPB rules will remain in effect, or if planned-for CFPB rules will in fact be going into effect as expected." (Id. ¶¶ 1, 13) Levy complains that "[s]uch uncertainty makes it exceedingly difficult for the Credit Union to determine whether, and to what degree, it should continue to engage in certain key compliance efforts." (Id. ¶ 14) Levy also states that Plaintiff "relies on the CFPB to prevent a recurrence of the 2008 financial crisis," that its members benefit from the CFPB's enforcement actions, and that Plaintiff's "ability to provide financial counseling services to its members is imperiled by Mr. Mulvaney's unlawful appointment." (Id. ¶¶ 16-18)

Levy expresses particular concern about a CFPB rule concerning prepaid debit cards, which is scheduled to become effective on April 1, 2018. (Id. ¶ 15) Many employers are using prepaid debit cards to pay wages to their employees. (Id.) The CFPB's rule "require[s] clear disclosures to cardholders about fees associated with the prepaid cards, require[s] the provider to allow a cardholder to easily determine a card's balance and transaction history, and protect[s] cardholders if their cards are lost, stolen, or wrongly charged." (Id.) According to Levy, "a number of [Plaintiff]'s members receive payroll cards from their employers or purchase prepaid cards to provide money to loved ones without bank accounts." (Id.) On December 21, 2017, the CFPB – under Mulvaney's leadership – stated that it was "postponing the April 1, 2018 effective date of the prepaid debit card rule and intends to amend the rule." (Levy Supp. Decl. (Dkt. No. 36) ¶ 25) Levy alleges that Plaintiff's members "are harmed by Mr. Mulvaney's

decision to postpone implementation of . . . clear fee disclosures, balance and transaction history information, and loss protection." (Id. ¶ 27)

Plaintiff is also concerned about the CFPB's enforcement of the HMDA. (See id. ¶¶ 3-24) In October 2015, the CFPB promulgated a final rule amending Regulation C, which implements the HMDA (the "2015 HMDA Rule"). See 80 Fed. Reg. 66,128 (Oct. 28, 2015). If implemented, the 2015 HMDA Rule would alter, inter alia, data collection, recording, reporting, and disclosure requirements. See id. The 2015 HMDA Rule was slated to become effective on January 1, 2018. Id.

On December 21, 2017, the CFPB, under Mulvaney's leadership, announced that

> for HMDA data collected in 2018 and reported in 2019[,] the Bureau does not intend to require data resubmission unless data errors are material. Furthermore, the Bureau does not intend to assess penalties with respect to errors in data collected in 2018 and reported in 2019. Collection and submission of the 2018 HMDA data will provide financial institutions an opportunity to identify any gaps in their implementation of amended Regulation C and make improvements in their HMDA compliance management systems for future years. Any examinations of 2018 HMDA data will be diagnostic to help institutions identify compliance weaknesses and will credit good faith compliance efforts.

(Levy Supp. Decl., Ex. A (Dec. 21, 2017 CFPB Statement) (Dkt. No. 36-1) at 2)

The CFPB also recently announced that it "intends to engage in a rulemaking to reconsider various aspects of the 2015 HMDA Rule[,] such as the institutional and transactional coverage tests and the rule's discretionary data points." (Id.) A CFPB press release explains that

> the rulemaking may re-examine lending-activity criteria that determine whether institutions are required to report mortgage data. The rulemaking may also look at adjusting the new requirements to report certain types of transactions. Finally, the rulemaking may re-assess the additional information that the rule requires beyond the new data points specified under the Dodd-Frank Act.

(Levy Supp. Decl., Ex. B (Dec. 21, 2017 CFPB Press Release) (Dkt. No. 36-2) at 3)

Levy contends that the actual and potential changes discussed in the CFPB's December 21, 2017 press release eliminate banks' incentives to invest funds in community credit unions such as Plaintiff. (Levy Supp. Decl. (Dkt. No. 36) ¶¶ 10-16) According to Levy, banks invest in community credit unions to meet their community investment obligations under the Community Reinvestment Act (the "CRA"). (Id. ¶ 12) Plaintiff currently holds $2.5 million in such deposits, and its business model is based, in part, on access to such deposits. (Id.) In determining whether a bank is in compliance with the CRA, regulators rely on, inter alia, accurate HMDA data. (Id. ¶ 11) According to Levy,

> [i]f financial institutions know there is no penalty for producing inaccurate data, they can misrepresent their HMDA data with impunity and appear to comply with the CRA. Without accurate HMDA data to establish that a bank has not sufficiently reinvested in the community, banks have little incentive to invest more in community financial institutions like [Plaintiff] to comply with the CRA, including by (i) making further deposits with [Plaintiff] and (ii) retaining the $2.5 million in deposits they have already made. Without the banks' non-member deposits, [Plaintiff]'s business model would suffer.

(Id. ¶ 15)

Levy also complains that Plaintiff "has spent considerable time to evaluate and ensure compliance with the CFPB's 2015 HMDA rule" (id. ¶ 17), and is now "unable to engage in long-range planning about what HMDA disclosures it will have to make." (Id. ¶ 19) Plaintiff will "have to invest further resources now to plan for its alternative disclosure obligations depending on Mr. Mulvaney's various potential revisions to HMDA." (Id. (emphasis in original))

Finally, Levy complains that the CFPB's alleged decision to "decimat[e]" the HMDA harms both Plaintiff's mission to "promote economic justice and opportunity in NYC neighborhoods," and Plaintiff's members, many of whom "live in the low-income communities whose mistreatment by banks prompted Congress to pass [the] HMDA in the first place." (Id.

7

¶¶ 21-24) According to Levy, "the transparency HMDA requires incentivizes banks to improve their lending practices," and "decimating HDMA permits banks to ignore – and deceive the public about – the impact of their lending practices on local communities." (Id. ¶ 22)

## DISCUSSION

### I.  LEGAL STANDARD

It is well established that "'[a] plaintiff must demonstrate standing for each claim and form of relief sought.'" Carver v. City of New York, 621 F.3d 221, 225 (2d Cir. 2010) (quoting Baur v. Veneman, 352 F.3d 625, 642 n.15 (2d Cir. 2003)). "Because standing is jurisdictional under Article III of the United States Constitution, it is a threshold issue in all cases[,] since putative plaintiffs lacking standing are not entitled to have their claims litigated in federal court." Shearson Lehman Hutton, Inc. v. Wagoner, 944 F.2d 114, 117 (2d Cir. 1991) (internal citation omitted).

> [T]he "irreducible constitutional minimum" of standing consists of three elements. Lujan [v. Defs. of Wildlife, 504 U.S. 555, 560 (1992)]. The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision. Id., at 560-561; Friends of the Earth, Inc. [v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 180-81 (2000)]. The plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing these elements. FW/PBS, Inc. v. Dallas, 493 U.S. 215, 231 (1990).

Spokeo, Inc. v. Robins, 136 S.Ct. 1540, 1547 (2016), as revised (May 24, 2016). The "elements are conjunctive, so that a failure of any of the three elements deprives a plaintiff of standing to maintain an action in federal court." Dickerson v. Feldman, 426 F. Supp. 2d 130, 134 (S.D.N.Y. 2006).

"To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" Spokeo, 136 S.Ct. at 1548 (quoting Lujan, 504 U.S.

8

at 560). "An allegation of future injury may suffice if the threatened injury is 'certainly impending,' or there is a '"substantial risk" that the harm will occur.'" Susan B. Anthony List v. Driehaus, 134 S. Ct. 2334, 2341 (2014) (quoting Clapper v. Amnesty Int'l USA, 568 U.S. 398, 414 n.5 (2013)). "For an injury to be 'particularized,' it 'must affect the plaintiff in a personal and individual way.'" Spokeo, 136 S. Ct. at 1548 (quoting Lujan, 504 U.S. at 560 n.1). "'As a general rule,' this means 'plaintiff must have personally suffered.'" In re the Bear Stearns Companies, Inc. Sec., No. 08 MDL 1963 (RWS), 2016 WL 4098385, at *17 (S.D.N.Y. July 25, 2016) (quoting W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP, 549 F.3d 100, 107 (2d Cir. 2008)). "Concreteness" refers to an injury that is "real, and not abstract." Spokeo, 136 S. Ct. at 1548 (internal quotation marks omitted).

An injury "'fairly can be traced to the challenged action of the defendant'" where "the exercise of the Court's remedial powers would redress the claimed injuries." Duke Power Co. v. Carolina Envtl. Study Grp., Inc., 438 U.S. 59, 74 (1978) (quoting Simon v. E. Ky. Welfare Rights Org., 426 U.S. 26, 41, 43 (1976)).

"For purposes of ruling on a motion to dismiss for want of standing, both the trial and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." Warth v. Seldin, 422 U.S. 490, 501 (1975). "While the standard for reviewing standing at the pleading stage is lenient, a plaintiff cannot rely solely on conclusory allegations of injury or ask the court to draw unwarranted inferences in order to find standing." Baur, 352 F.3d at 636-37. "In resolving a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), a district court . . . may refer to evidence outside the pleadings." Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000)).

9

"An organization can have standing to sue in one of two ways." N.Y. Civil Liberties Union v. N.Y. Transit Auth., 684 F.3d 286, 294 (2d Cir. 2012). "It may sue on behalf of its members, in which case it must show, inter alia, that some particular member of the organization would have had standing to bring the suit individually." Id. (citations omitted). Alternatively, "an organization can 'have standing in its own right to seek judicial relief from injury to itself and to vindicate whatever rights and immunities the association itself may enjoy.'" Id. (citations omitted).

## II. ANALYSIS

Here, Plaintiff argues that it has standing in its own right because: (1) it is regulated by the CFPB; (2) the CFPB's actions under Mulvaney's leadership have harmed Plaintiff's mission of improving the financial health of underserved communities; (3) "the CFPB's decision to effectively gut the HMDA rules" will cause Plaintiff economic harm; and (4) Plaintiff has suffered injury as a result of uncertainty caused by the CFPB's stated intention to engage in rulemaking regarding the HMDA. (Pltf. Reply (Dkt. No. 37) at 29-37)

### A. Standing Based on Status as a Regulated Entity

Plaintiff claims that "[t]he basic three-part test of standing . . . is easily met [here]," because Plaintiff "is injured by being regulated on an ongoing basis by an unconstitutionally run agency, directly traceable to defendants' unlawful takeover of the Bureau," and "a preliminary injunction would remedy that ongoing injury." (Id. at 33 (internal quotation marks and citation omitted)) Plaintiff argues that it "need establish no additional evidence of harm." (Id. at 30)

In Lujan, the Supreme Court noted that where a plaintiff "is [itself] an object of the [government] action (or foregone action) at issue . . . there is ordinarily little question that the

10

action or inaction has caused [plaintiff] injury, and that a judgment preventing or requiring the action will redress it." Lujan, 504 U.S. at 561-62. By contrast, "when the plaintiff is not [itself] the object of the government action or inaction [it] challenges, standing is not precluded, but it is ordinarily 'substantially more difficult' to establish." Id. at 562 (citations omitted).

In contending that it has standing simply because it is regulated by the CFPB (see Pltf. Reply (Dkt. No. 37) at 33), Plaintiff relies on the D.C. Circuit's decision in State National Bank of Big Spring v. Lew, 795 F.3d 48 (D.C. Cir. 2015). The issue in State National Bank was whether the plaintiff bank had standing to challenge the constitutionality of the CFPB's structure and of Richard Cordray's recess appointment as CFPB Director. State National Bank, 795 F.3d at 53-54. The D.C. Circuit decided that the plaintiff bank had standing to assert its claims because it was "not a mere outsider asserting a constitutional objection to the Bureau," but rather, "was regulated by the Bureau." Id. at 53. In this regard, the court noted that the CFPB had

> already exercised its broad regulatory authority to impose new obligations on banks, including State National Bank. For example, in 2012 the Bureau promulgated the Remittance Rule. See 12 C.F.R. §§ 1005.30-1005.36. The Remittance Rule imposes disclosure requirements on institutions that offer international remittance transfers, which are electronic money transfers. The Rule also offers a safe harbor, but banks such as State National Bank must incur costs to ensure that they are properly complying with the terms of that safe harbor. See 77 Fed. Reg. 50,244, 50,274-75 (Aug. 20, 2012). The Bank indeed alleged that it must now monitor its remittances to stay within the safe harbor, and the monitoring program causes it to incur costs.

Id.

The court concluded that

> [t]here is no doubt that the Bank is regulated by the Bureau. Under Lujan, the Bank therefore has standing to challenge the constitutionality of the Bureau. . . . For the same reasons that the Bank has standing to challenge the unconstitutionality of the Bureau, the Bank has standing to challenge Director Cordray's recess appointment.

11

Id. at 53-54.

A more recent D.C. Circuit decision makes clear that State National Bank does not announce a new rule that any plaintiff regulated by an agency automatically has Article III standing to sue that agency. John Doe v. CFPB, 849 F.3d 1129 (D.C. Cir. 2017). In Doe, an entity regulated by the CFPB sought to avoid compliance with a CFPB civil investigative demand by challenging the constitutionality of the CFPB's single-director independent agency structure.[1] Doe, 849 F.3d at 1130-32. Noting that "'[s]tanding is not dispensed in gross,'" and that "a 'plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought,'" id. at 1132 (quoting Davis v. FEC, 554 U.S. 724, 734 (2008)), the D.C. Circuit ruled that plaintiff lacked standing to assert its claim that the Bureau's structure was unconstitutional. Id. at 1132-33. The court explained:

> [Plaintiff]'s sole argument is that the Bureau's single-Director structure is unconstitutional. And the sole injury it asserts on appeal is the harm occasioned by having to respond to a non-self-executing [civil investigative demand]. . . . Standing is determined on a claim-by-claim basis. . . . [Plaintiff] accordingly has to demonstrate that the action of merely requesting information from private entities subject to regulation is by itself exclusively confined to the Executive Branch, and thus that issuance of this [civil investigative demand] by the Bureau violates the separation of powers. . . . The Company has utterly failed that task.

Id. at 1132-33. In distinguishing State National Bank, the court noted that plaintiff did not "object to any other regulatory measure taken by the Bureau, or identify in its injunction papers other regulatory burdens to which it objects." Id. at 1132 n.1 (citing State Nat'l Bank, 795 F.3d at 53).

---

[1] The company in Doe argued that the issuance of the civil investigative demand by the CFPB violated separation of powers, because "the action of . . . requesting information from private entities subject to regulation is . . . exclusively confined to the Executive Branch." Id. at 1132-33.

12

Here, it is undisputed that Plaintiff is regulated by the CFPB (see Def. Opp. (Dkt. No. 31) at 20-21), and that it must comply with, inter alia, the CFPB's rules regarding mortgage disclosures, determinations of an applicant's ability to repay a mortgage, collection and reporting of mortgage data, and international money transfers. (Levy Decl. (Dkt. No. 10-3) ¶¶ 7-10) Accordingly, like the plaintiff bank in State National Bank, Plaintiff is not a "mere outsider" objecting to an alleged unconstitutional leadership change at the CFPB. State Nat'l Bank, 95 F.3d at 53. Plaintiff also objects to several actions taken or not taken by the CFPB under Mulvaney's leadership, including "[n]ot assessing penalties against financial institutions that do not comply with [the] HMDA," "[n]ot requiring financial institutions to correct so-called 'non-material' errors to their HMDA reporting," and "[d]elaying the April 1, 2018 scheduled implementation of the prepaid debit card rule." (Levy Supp. Decl. (Dkt. No. 36) ¶ 28)

Unlike in State National Bank, however, Plaintiff does not contend that the CFPB has "exercised its broad regulatory authority to impose new obligations on [Plaintiff]" – to which it objects – and which have "cause[d] it to incur costs" that it would no longer incur if it succeeded on its claims.[2] State Nat'l Bank, 795 F.3d at 53. Instead, Plaintiff argues that simply

---

[2] Plaintiff asserted for the first time at oral argument that CFPB's amendments to HMDA reporting requirements – which became effective on January 1, 2018, under Mulvaney's leadership – are causing Plaintiff to incur costs. (Jan. 12, 2018 Tr. at 10; see also Jan. 19, 2018 Pltf. Ltr. (Dkt. No. 50) at 1-2) Plaintiff conceded at oral argument that it does not object to these regulatory changes, however. (Jan. 12, 2018 Tr. at 10-12) Accordingly, Plaintiff has suffered no injury-in-fact as a result of the alleged regulatory changes. See Doe, 849 F.3d at 1132 (holding that plaintiff lacked standing to challenge the CFPB's structure as unconstitutional based on plaintiff's receipt of a civil investigative demand, and noting that plaintiff "voice[d] no objection [] to the scope or content of the [civil investigative demand] and [did] not argue that it [fell outside] the Bureau's statutory authority"); see also id. at 1132 n.1 ("Nor does [plaintiff] . . . identify in its injunction papers other regulatory burdens to which it objects."). Nor has Plaintiff shown that this alleged new regulatory burden is "fairly . . . trace[able] to the challenged action of the defendant[s]," Lujan, 504 U.S. at 560, because the final rule imposing these new requirements was promulgated in September 2017 – four months before Mulvaney was designated Acting Director. See 82 Fed. Reg. 43,088 (Sept. 13, 2017). Plaintiff also has not

13

"[b]ecause [Plaintiff] is regulated by the CFPB, it has standing to challenge Mr. Mulvaney's appointment." (Pltf. Reply (Dkt. No. 37) at 29) Doe makes clear that the D.C. Circuit does not endorse such a broad view of standing.[3]

In sum, the mere fact that Plaintiff is regulated by the CFPB does not confer standing to bring this suit. Plaintiff must instead allege a concrete and particularized injury caused by CFPB actions taken under Mulvaney's leadership.

### B. Standing Based on Harm to Corporate Mission

Plaintiff argues that it has standing because the CFPB, under Mulvaney's leadership, has harmed Plaintiff's "mission of improving the financial health of underserved communities." (Id.) The Supreme Court has stated, however, that organizations advocating for a particular policy goal who have "allege[d] no injury to themselves as organizations" may "not

---

shown that "it is likely" that this alleged injury "will be redressed by a favorable decision." Friends of the Earth, 528 U.S. at 181. A determination that Mulvaney's appointment was unlawful would not invalidate final rules promulgated before his tenure. Finally, as discussed below, standing cannot be premised on post-complaint conduct, and the January 1, 2018 effective date of the new provisions is almost four weeks after the Complaint was filed.

[3] Plaintiff also cites Free Enterprise Fund v. Public Company Accounting Oversight Board, 561 U.S. 477 (2010), and Olympic Federal Savings & Loan Association v. Office of Thrift Supervision, 732 F. Supp. 1183 (D.D.C. 1990), appeal dismissed and remanded, 903 F.2d 837 (D.C. Cir. 1990), in support of its argument that it has standing simply because it is regulated by the CFPB. (See Pltf. Reply (Dkt. No. 37) at 32) Free Enterprise Fund is inapposite. The jurisdictional issue in that case is whether a statutory provision restricts judicial review, not whether petitioners have Article III standing. See Free Enter. Fund, 561 U.S. at 489-91. Furthermore, a petitioner in that case – an accounting firm – had clearly been harmed by the respondent agency's actions, given that the agency had "inspected the [accounting] firm, released a report critical of its auditing procedures, and beg[u]n a formal investigation" before petitioner filed suit. See id. at 487.

Olympic Federal Savings & Loan Association is likewise inapposite. In that case, plaintiff "face[d] a sufficiently direct and imminent threatened harm to have standing," Olympic Fed. Savs. & Loan Ass'n, 732 F. Supp. at 1188 n.3, because the defendant agency had "made clear that – absent an injunction – at any moment and with no notice to either plaintiff or the court it [might] appoint a receiver or conservator, instruct him or her to take control of [plaintiff]'s operations, and perhaps begin liquidating the [plaintiff]." Id. at 1187 (emphasis in original).

14

establish their standing simply on the basis of that goal." Simon, 426 U.S. at 39-40. Accordingly, Plaintiff does not have standing based solely on alleged harm to its corporate mission. See id. at 40 ("[A]n organization's abstract concern with a subject that could be affected by an adjudication does not substitute for the concrete injury required by Art. III.").

The cases cited by Plaintiff are not to the contrary. See N.Y. Civil Liberties Union, 684 F.3d at 295 (holding that the New York Civil Liberties Union had standing to challenge the policy governing public access to hearings conducted by the Transit Adjudication Bureau, because the "access policy has impeded, and will continue to impede, the organization's ability to carry out [its professional] responsibility [to represent clients before the Bureau]"); Nnebe v. Daus, 644 F.3d 147, 157 (2d Cir. 2011) (requiring a "'perceptible impairment' of an organization's activities . . . for there to be an 'injury in fact'") (citation omitted).

### C. Standing Based on Policy Changes Regarding HMDA Compliance

Plaintiff claims that it will suffer economic injury "as a result of the CFPB's decision to effectively gut the HMDA rules," because banks – under the CFPB's new policies – will have less incentive to invest in community credit unions such as Plaintiff. (Pltf. Reply (Dkt. No. 37) at 35) On December 21, 2017 – sixteen days after Plaintiff filed its Complaint – the CFPB announced that it "does not intend to require data resubmission" for HMDA data collected in 2018 and reported in 2019 "unless data errors are material," and that it "does not intend to assess penalties with respect to errors in data collected in 2018 and reported in 2019." (Levy Supp. Decl., Ex. A (Dec. 21, 2017 CFPB Statement) (Dkt. No. 36-1) at 2)

Courts generally determine standing based on the facts that exist when a complaint is filed. See Lujan, 504 U.S. at 569 n.4 ("The existence of federal jurisdiction ordinarily depends on the facts as they exist when the complaint is filed.") (internal quotation

marks, citation, and emphasis omitted); see also Davis, 554 U.S. at 734 ("[T]he standing inquiry remains focused on whether the party invoking jurisdiction had the requisite stake in the outcome when the suit was filed."); Chen-Oster v. Goldman, Sachs & Co., 251 F. Supp. 3d 579, 589 (S.D.N.Y. 2017) ("Standing is generally determined when the complaint is filed."). Here, Plaintiff has not offered any basis for departing from the general rule. Accordingly, Plaintiff cannot assert standing based on CFPB statements issued after the Complaint was filed.

Even if standing could be premised on post-complaint actions, Plaintiff has not identified a cognizable injury flowing from the CFPB's December 21, 2017 public statements. Plaintiff argues that – if the CFPB does not penalize banks for errors in HMDA data collected in 2018 and reported in 2019 – the banks that are currently investing in community credit unions will begin falsifying their HMDA records, and then will rely on that inaccurate data to demonstrate Community Reinvestment Act compliance, permitting them to reduce their deposits with credit unions such as Plaintiff. (See Levy Supp. Decl. (Dkt. No. 36) ¶ 15 ("If financial institutions know there is no penalty for producing inaccurate data, they can misrepresent their HMDA data with impunity and appear to comply with the CRA. Without accurate HMDA data to establish that a bank has not sufficiently reinvested in the community, banks have little incentive to invest more in community financial institutions like the Credit Union to comply with the CRA."))

This "highly attenuated chain of possibilities[] does not satisfy the requirement that threatened injury must be certainly impending," Clapper, 568 U.S. at 410, and Plaintiff's speculation regarding the future actions of third parties is not sufficient to establish an imminent

injury.[4] See id. at 415 ("We decline to abandon our usual reluctance to endorse standing theories that rest on speculation about the decision of independent actors."); Taylor v. Bernanke, No. 13-CV-1013 (ARR), 2013 WL 4811222, at *6 (E.D.N.Y. Sept. 9, 2013) ("Where the occurrence of the future injury depends on the actions of a third party not included in the plaintiff's suit, the Supreme Court has shown particular reluctance to conclude that the 'imminence' requirement is met."); Himber v. Intuit, Inc., No. 10-CV-2511 (JFB), 2012 WL 4442796, at *7 (E.D.N.Y. Sept. 25, 2012) ("As the jurisprudence of the Supreme Court and Second Circuit has clearly articulated, claims of harm based upon speculation regarding decisions by third parties is insufficient to confer Article III standing.").

Plaintiff's fear-based theory of standing also does not meet the redressability requirement, because Plaintiff has not shown that its anticipated injury is "fairly . . . trace[able] to" the Defendants, Lujan, 504 U.S. at 560, as opposed to the independent actions of third-parties. "No standing exists for . . . hypothetical, speculative harm that [i]s preventable only by the discretionary decisions of third parties." Himber, 2012 WL 4442796, at *9; see also Branton v. FCC, 993 F.2d 906, 910-11 (D.C. Cir. 1993) ("The Supreme Court is particularly disinclined to find that the causation and redressability requirements are satisfied where a complainant challenges only an Executive Branch decision not to impose costs or penalties upon some third party."). Accordingly, this theory of standing likewise fails.

---

[4] Plaintiff cites Ross v. Bank of America, N.A. (USA), for the proposition that an injury-in-fact "'may simply be the fear or anxiety of future harm.'" Ross, 524 F.3d 217, 222 (2d Cir. 2008) (quoting Denney v. Deutsche Bank AG, 443 F.3d 253, 264 (2d Cir. 2006)). More recent Second Circuit authority makes clear, however, that fear-based standing requires "an imminent threat of future harm or a present harm incurred in consequence of such a threat." Hedges v. Obama, 724 F.3d 170, 188-89 (2d Cir. 2013) (citing Lujan, 504 U.S. at 564 & n.2; Clapper, 133 S.Ct. at 1150 n.5)); see also Feinberg v. Apple, Inc., No. 15-CV-5198 (RA), 2016 WL 4371746, at *3 (S.D.N.Y. Aug. 10, 2016) ("Since Ross, the Second Circuit has clarified that allegations of fear or anxiety of future harm are alone insufficient to confer standing.").

17

D.   **Standing Based on the CFPB's Announced
     <u>Intention to Engage in Rulemaking</u>**

Plaintiff asserts that it is "further injured by the uncertainty resulting from the CFPB's statement . . . that it 'intends to engage in a rulemaking to reconsider various aspects of the 2015 HMDA Rule.'" (Pltf. Reply (Dkt. No. 37) at 36 (citation omitted)) According to Plaintiff's chief executive,

> [t]he Credit Union is unable to engage in long-range planning about what HMDA disclosures it will have to make. The Credit Union will have to invest further resources <u>now</u> to plan for its alternative disclosure obligations depending on Mr. Mulvaney's various potential revisions to HMDA. For the Credit Union, this is wasteful, time-consuming, and a direct result of the actions Mr. Mulvaney has taken since he seized power at the CFPB.

(Levy Supp. Decl. (Dkt. No. 36) ¶ 19 (emphasis in original))

The intent to engage in rulemaking concerning the HMDA was announced in the CFPB's December 21, 2017 public statements, which were issued after this lawsuit was filed. As discussed above, standing cannot be premised on post-complaint conduct. Even if Plaintiff could rely on such statements, the alleged injury flowing from this expression of agency intent is too "conjectural" and "hypothetical" to confer standing. <u>Spokeo</u>, 136 S.Ct. at 1548. A plaintiff must allege "more than the possibility an agency may one day reverse its position," because "[i]t would be a strange thing indeed if uncertainty were a sufficiently certain harm to constitute an injury in fact." <u>New Eng. Power Generators Ass'n, Inc. v. FERC</u>, 707 F.3d 364, 369 (D.C. Cir. 2013); <u>see also</u> <u>Habeas Corpus Res. Ctr. v. DOJ</u>, 816 F.3d 1241, 1250 (9th Cir. 2016) ("The Defender Organizations' bare uncertainty regarding the validity of the Final Regulations and applicability of Chapter 154 to their clients' federal habeas cases, absent any concrete application that threatens imminent harm to their interests, cannot support standing.") (internal quotation marks and citation omitted); <u>In re Wingerter</u>, 594 F.3d 931, 946 (6th Cir. 2010) ("Uncertainty,

18

like unfavorable dicta and the possibility of future relitigation, is an insufficient basis for Article III standing.").

Plaintiff argues that the CFPB has "affirmatively stat[ed] that it would be rewriting a rule plaintiff must obey" (Pltf. Reply (Dkt. No. 37) at 37 (emphasis omitted)), but this is not true. The CFPB announced that it "intends to engage in a rulemaking to reconsider various aspects of the 2015 HMDA Rule" (Levy Supp. Decl., Ex. A (Dec. 21, 2017 CFPB Statement) (Dkt. No. 36-1) at 2), and that the rulemaking "may re-examine lending-activity criteria," "may also look at adjusting the new requirements to report certain types of transactions," and "may re-assess the additional information that the rule requires beyond the new data points specified under the Dodd-Frank Act." (Levy Supp. Decl., Ex. B (Dec. 21, 2017 CFPB Press Release) (Dkt. No. 36-2) at 3) The CFPB's announced intent to "reconsider" a rule, and its statement that it "may" "re-examine" or "re-assess" certain components of a rule, do not establish that an agency rule will in fact be altered. Moreover, standing is not established "where a plaintiff challenges an agency publication which is 'neither a rule nor a precedent but is merely an announcement to the public of the policy which the agency hopes to implement in future rulemaking[]. . . .'" Nat'l Multi Hous. Council v. Jackson, 539 F. Supp. 2d 425, 429 (D.D.C. 2008) (quoting Utility Air Regulatory Group v. EPA, 320 F.3d 272, 278 (D.C. Cir. 2003)).

Plaintiff also contends that "[c]ourts have repeatedly held that a regulated business has standing to challenge an agency action that precludes 'long-range economic planning.'" (Pltf. Br. (Dkt. No. 37) at 37) The cases cited by Plaintiff are clearly distinguishable, however. In United States v. Storer Broad. Co., for example, "[t]he process of rulemaking was complete." Storer Broad., 351 U.S. 192, 198 (1956). In Rio Grande Pipeline Co. v. FERC, there was "no serious doubt over [petitioner's] aggrievement," because it was

undisputed that FERC's decision not to immunize current pipeline rates from third-party protests "had a profoundly negative effect on the active marketing of [petitioner's] project to new potential users," had "made existing and potential investors extremely skeptical over further investment in the project," and "negatively impac[ted] both [petitioner]'s ability to raise debt capital and its general creditworthiness." Rio Grande Pipeline, 178 F.3d 533, 540 (D.C. Cir. 1999) (internal quotation marks omitted). Similarly, in Great Lakes Gas Transmission Limited Partnership v. FERC, FERC's decision to place an at-risk condition on the petitioner's certificate to expand its pipeline facility had "a present injurious effect on [petitioner's] business decisions and competitive posture within the industry." Great Lakes Gas Transmission Ltd., 984 F.2d 426, 430 (D.C. Cir. 1993). Here, Plaintiff's bare assertion that CFPB's intent to engage in rulemaking forces Plaintiff to "invest further resources now" (Levy Supp. Decl. (Dkt. No. 36) ¶ 19 (emphasis in original)), alleges an injury that is far less "distinct and palpable." Nnebe, 644 F.3d at 156.

Plaintiff's standing cannot be premised on the CFPB's stated intent to engage in rulemaking.

## CONCLUSION

Because Plaintiff has not demonstrated that it has standing to bring this action, Defendants' motion to dismiss is granted. Plaintiff's motion for a preliminary injunction is denied as moot. The Clerk of the Court is directed to terminate the motions (Dkt. Nos. 10, 30), and to close this case.

Dated: New York, New York
       February 1, 2018

SO ORDERED.

_____
Paul G. Gardephe
United States District Judge